Argued and submitted November 12, 1980, affirmed in part; modified in part May 26, reconsideration denied August 3, petition for review denied October 20, 1981 (291 Or 771)

# AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, LOCALS 2623-A, 2623-B AND 191-B, *Petitioners,*

*v.*

## EXECUTIVE DEPARTMENT et al, *Respondents.*

(No. C-268-79, CA 18045 (Control))

## EXECUTIVE DEPARTMENT et al, *Petitioners,*

*v.*

# AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYES, LOCALS 2623-A, 2623-B AND 191-B et al, Respondents.

(No. C-268-79, CA 17923)
(cases consolidated)

628 P2d 1228

───────────────

Henry H. Drummonds, Eugene, argued the cause for petitioners (CA 18045). With him on the brief were Jennifer Friesen, and Kulongoski, Heid, Durham & Drummonds, Eugene.

Al J. Laue, Assistant Attorney General, Salem, argued the cause for respondents (CA 18045). With him on the brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Al J. Laue, Assistant Attorney General, Salem, argued the cause for petitioners (CA 17923). With him on the brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor Genral, William F. Gary, Deputy Solicitor General, and John S. Irvin, Assistant Attorney General, Salem.

Henry H. Drummonds, Eugene, argued the cause for respondents (CA 17923). With him on the brief were Jennifer Friesen, and Kulongoski, Heid, Durham & Drummonds, Eugene.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges.

ROBERTS, J.

Gillette, J. concurring opinion.

## ROBERTS, J.

We have consolidated these two appeals from a decision of the Employment Relations Board (ERB), interpreting for the first time the compulsory arbitration provisions of the public employes collective bargaining statute, ORS 243.650-782. They require us to determine whether the Oregon Legislature, in enacting the Public Employment Relations Act,[1] intended to remove from the State Personnel Division the authority to set salaries for individual employes in collective bargaining units.[2] In addition, we must determine the authority of an arbitrator to set salaries when employes in a bargaining unit are forbidden by law from striking.

The state's appeal places before us procedural and jurisdictional questions. The appeal by the local chapters of the American Federation of State, County and Municipal Employes (AFSCME) raises the substantive issue of whether certain members of these locals are entitled to the benefits of binding interest arbitration pursuant to ORS 243.742[3] because they are forbidden from striking either as "guards" or "policemen" within the language of ORS 243.736[4] or because they are "included in an appropriate

---

[1] Oregon Laws 1973, ch 536.

[2] The Division has salary-setting authority pursuant to the Oregon Civil Service statutes, ORS ch 240, Oregon Laws 1945, ch 400.

[3] ORS 243.742 provides:

"(1) It is the public policy of the State of Oregon that where the right of employes to strike is by law prohibited, it is requisite to the high morale of such employes and the efficient operation of such departments to afford an alternate expeditious, effective and binding procedure for the resolution of labor disputes and to that end the provisions of ORS 240.060, 240.065, 240.080, 240.123, 243.650 to 243.782, 292.055, 341.290, 662.705, 662.715 and 662.785, providing for compulsory arbitration, shall be liberally construed.

"(2) When the procedures set forth in ORS 243.712 and 243.722, relating to mediation and factfinding of a labor dispute, have not culminated in a signed agreement between the parties who are prohibited from striking, the public employer or exclusive representative of its employes shall petition the board in writing to initiate binding arbitration. In lieu of a petition, the board on its own motion may initiate such arbitration if it deems it appropriate and in the public interest."

[4] ORS 243.736 provides:

"It shall be unlawful for any policeman, fireman or guard at a correctional institution or mental hospital to strike or recognize a picket line of a labor organization while in the performance of official duties."

bargaining unit which provides for resolution of labor disputes by referral to binding arbitration" under ORS 243.726(1).[5] We begin first with the history of this dispute.

## HISTORY

The AFSCME chapters are public employe labor organizations as defined by ORS 243.650(12). The state agencies are public employers within the meaning of ORS 243.650(18). We are asked to review a final order of ERB ordering the employers to implement an arbitrator's award of wages and benefits for certain members of Locals 2623-A and 2623-B, but denying extension of the award to other members of the chapters and all members of Local 191-B.

Local 2623-A is the exclusive representative of all classified employes of the Oregon State Penitentiary (OSP); Local 2623-B is the exclusive representative of all employes at the Oregon Women's Corrections Center (OWCC). Local 191-B is the exclusive representative of a unit of 32 juvenile parole officers of the Children's Services Division of the Oregon Department of Human Resources. The OSP bargaining unit contains approximately 400 members, the OWCC unit about 32.

The parties had previously negotiated a central collective bargaining agreement, which expired by its terms on July 1, 1979. In January, 1979, the parties began to negotiate a successor central agreement, with the State Executive Department negotiating on behalf of the individual agency employers. In March, 1979, after a period of negotiation, an impasse was reached as to certain wage and benefit matters. The union, pursuant to ORS 243.712, requested ERB to initiate mediation. When mediation failed to facilitate an agreement, ERB conducted fact-finding, pursuant to ORS 243.722, in May and June, 1979. On June 20, 1979, the union notified ERB that it did not accept the findings and requested arbitration. ERB

---

[5] ORS 243.726(1) states, in part:

"(1) Participation in a strike shall be unlawful for any public employe who is * * * included in an appropriate bargaining unit which provides for resolution of a labor dispute by referral to final and binding arbitration; * * *."

initiated arbitration on June 29, 1979, two days before the old contract expired and the state's new fiscal year began.[6]

AFSCME's position was that the Public Employment Relations Act (PERA), ORS 243.650 et seq., required compulsory arbitration as the alternative to potential strikes by any of the employes in these bargaining units and that, therefore, the parties were required by law to submit their differences to an arbitrator for a final and binding decision. ORS 243.650(5).[7] The state has consistently taken the position that binding arbitration was required only in the case of the approximately 200 employees at the two correctional institutions who are "guards" or "security staff," specifically those classified as correctional officers, corporals or sergeants. The arbitrator's award, issued October 27, 1979, was unclear on this point. It said that management "had a point when it insists [sic] that any decision reached by this arbitrator would be limited to those employes who could fairly be said to be policemen, firemen or certain types of guards * * *" and candidly noted that the final decision as to scope would be made on appeal. The arbitrator did, however, award salary increases and adjustments to specific classes of workers not within the "security" classifications. The award was made retroactive to July 2, 1979.

The state refused to implement the award, even as to the employes it conceded were guards or security staff. On December 3, 1979, AFSCME filed an unfair labor practice proceeding before ERB, alleging, among other things, that by refusing to implement a compulsory arbitration award the state had violated ORS 243.742 and 243.752 and committed an unfair labor practice under ORS 243.672(1)(f) and (g).[8] The complaint also petitioned ERB to

---

[6] According to ERB's findings of fact, "both parties were aware that the arbitrator's award could be effective for fiscal 1979-1980 only if arbitration were initiated before the fiscal year began on July 1." *See* ORS 243.752.

[7] "Compulsory arbitration" is defined at ORS 243.650(5) as:

"* * * the procedure whereby parties involved in a labor dispute are required by law to submit their differences to a third party for a final and binding decision."

[8] ORS 243.752 provides, in pertinent part:

seek enforcement of the arbitrator's award in circuit court pursuant to ORS 243.752. On the same day the state filed a motion to set aside the arbitration award. This was later refiled as an answer to the complaint, raising ten affirmative defenses, some of which have resurfaced here.[9]

The ERB order, issued May 23, 1980, found that the state had violated ORS 243.672(1)(g) by refusing to implement the award for employes classified as correctional officers, corporals or sergeants and directed implementation of the award as to these employes. The petition for

"A majority decision of the arbitration panel, under ORS 243.706 and 243.726, 243.736 to 243.746, if supported by competent, material and substantial evidence on the whole record, based upon the factors set forth in subsection (4) of ORS 243.746 shall be final and binding upon the parties, and may be enforced at the instance of either party or the board in the circuit court for the county in which the dispute arose. * * *"

Unfair labor practices are defined at ORS 243.672. The portions cited by AFSCME make it an unfair labor practice to:

"(f) Refuse or fail to comply with any provision of ORS 243.650 to 243.782.

"(g) Violate the provisions of any written contract with respect to employment relations including an agreement to arbitrate or to accept the terms of an arbitration award, where previously the parties have agreed to accept such awards as final and binding upon them."

[9] The state's answer charged the award:

(1) was repugnant to PERA because it applied a binding arbitration award to employes who were not "guards at a correctional institution;"

(2) failed to meet the requirement of ORS 243.746(4) that it be based on "competent, material and substantial evidence on the whole record;"

(3) failed to consider the statutory factors required by ORS 243.746(4);

(4) violated Presidential Executive Order 12092 and section 205(a) of the Federal Property and Administrative Services Act of 1949 by violating the state's voluntary wage and price guidelines;

(5) violated the merit system compensation principles of ORS ch 240, requiring a uniform standard of compensation for all employes in a single job classification;

(6) violated ORS ch 237 and the federal Internal Revenue Code by requiring a retroactive employer "pickup" of employe contributions to the retirement system;

(7) manifested an unlawful delegation of authority in violation of Or Const, Art I, § 21, Art III, § 1 and Art IV, § 1;

(8) violated the debt limitation provision of Or Const, Art XI, § 7;

(9) was a denial of equal protection under the law; and

(10) violated ORS 243.752 by making the award retroactive.

circuit court enforcement of the arbitration award was deferred for 30 days to allow the state to comply voluntarily.

The state did not comply with ERB's order. On June 23, 1980, both parties filed petitions for judicial review. AFSCME seeks reversal of that part of the order denying binding arbitration to other members of Locals 2623-A, 2623-B and 191-B. The state seeks reversal of those portions of the order finding an unfair labor practice and compelling implementation of the arbitration award.

The state alleges that ERB erred in ordering enforcement of the arbitration award, in finding that the award was just and reasonable, and in affirming the arbitration award without the approval of the Personnel Division and of the governor. The state also argues the award is invalid because the arbitrator failed to follow the required arbitration procedure.

AFSCME alleges that: ERB erred in interpreting ORS 243.736 to exclude from "guard" status employes of OSP and OWCC not formally designated as correctional officials; ERB did not make adequate findings of fact to support its conclusion that certain employes of OSP and OWCC are not "guards" within ORS 243.736; the remaining employes are entitled to arbitration because they are "included in an appropriate bargaining unit which provides for resolution of labor disputes by referral to binding arbitration" under ORS 243.726(1) and are thus forbidden to strike and are entitled to binding arbitration under ORS 243.742; ERB erred in interpreting ORS 243.736 to exclude the juvenile parole officers, members of Local 191-B, as "policemen" forbidden to strike and entitled to binding arbitration; and ERB erred in failing to base its enforcement order on ORS 243.672(1)(f) as well as ORS 243.672(1)(g).

The state's arguments, since they are procedural, are dealt with first.

## JURISDICTION

The state contends that ERB was without jurisdiction to review the award because ORS 243.752, providing that an arbitration award "may be enforced at the instance

of either party or the board in the circuit court for the county in which the dispute arose," mandates exclusive review by the circuit court. This contention is erroneous. The language of ORS 243.752 is, first of all, permissive.[10] As one commentator has pointed out, an arbitrator's award has the nature of both a judgment and a contract, at least where it is the result of an agreement whereby the parties have agreed to comply with the award. Thus, it is common that when arbitration is conducted pursuant to a statute, it is usually provided that the award may be filed in court and judgment entered on it.

> "The procedure for converting an award into a judgment is often followed in commercial arbitrations, but is practically never used in labor arbitrations. The reasons are, first, that the parties are anxious to avoid the courts and second, that labor disputes are usually of such a nature that no benefit would accrue from the security of a judgment." Updegraff and McCoy, *Arbitration of Labor Disputes* 215 (1961).

While the court's contempt power pursuant to ORS 33.010(1)(e) might be of some benefit, AFSCME chose not to go directly to circuit court, but to pursue another permissible method of enforcement: it alleged that in refusing to implement the arbitrator's award the state had committed an unfair labor practice, i.e., violated ORS 243.672(1)(g), and asked ERB to issue a cease and desist order.[11] ERB

---

[10] Under federal labor law, refusals to comply with arbitration awards are actionable in U. S. district courts as breach of contract claims. The U. S. Supreme Court has held that, in such an action, judicial review of an arbitrator's award is confined to a determination of whether or not the claim is arbitrable and courts may not reach the merits of the award. *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 US 593, 80 S Ct 1358, 4 L Ed 2d 1424 (1960); *United Steelworkers v. American Mfg. Co.,* 363 US 564, 80 S Ct 1343, 4 L Ed 2d 1403 (1960). Since Oregon's Public Employment Relations Act is modeled in many respects after the National Labor Relations Act, we have said before that federal decisions interpreting the NLRA will be given some weight in interpreting the Oregon statute. *Klamath County v. Laborers Inter. Union,* 21 Or App 281, 534 P2d 1169 (1974); *see* Comment, *Applying Private Sector Law to the Public Sector Strike in Oregon,* 56 Or L Rev 251, 253-254 (1977). Since, however, ERB, unlike the National Labor Relations Board, has the authority to hear claims of statutory violations and breach of contract claims as unfair labor practice complaints, ORS 243.672(1)(g), (2)(d); Brodie, *Public Sector Collective Bargaining in Oregon,* 54 Or L Rev 337, 339 (1975), the court's role in our arbitration scheme should, presumably, be even more limited.

[11] AFSCME did petition ERB to seek enforcement of the award in the circuit court, but ERB deferred its enforcement request to allow the state to voluntarily comply.

must, pursuant to ORS 243.766(4), petition the appropriate circuit court for enforcement of *any* order on an unfair labor practice, representation matter or arbitration issue which is not voluntarily complied with. ORS 243.752, in permitting circuit court enforcement of an arbitrator's award, allows the party requesting such relief (the party to whom the award is favorable) to, in some instances, skip a procedural step. Jurisdiction for unfair labor practice complaints rests exclusively with ERB. ORS 243.672(4); *see also* 243.766(3). The complaint alleging an unfair labor practice was properly before ERB.

## CONSIDERATION OF FACTORS REQUIRED BY ORS 243.746

The state's second assignment of error is that ERB erred in finding the arbitrator's award "just and reasonable," as required by ORS 243.746(5).[12] The arbitrator's award gave the covered employes salary increases equal to the increase in the Consumer Price Index (CPI) every four months, while other state employes, based on the terms of their collective bargaining agreements, receive four-month raises based on the CPI but limited to 2 percent. The state argues that this is an open-ended appropriation, showing that the arbitrator failed to consider "the financial ability of the unit of government to meet those costs," as required by ORS 243.746(4)(c). It also argues that since this award "is at least 20 percent higher than that of 93 percent of the general class of state employes," it is apparent that the arbitrator failed to take into account a "comparison of wages, hours and conditions of employment of other employes performing similar services and with other employes generally" required by ORS 243.746(4)(d), in particular a

---

[12] ORS 243.746(5) provides that:

"(5) Not more than 30 days after the conclusion of the hearings or such further additional periods to which the parties may agree, the arbitrator shall make written findings of fact and promulgate a written opinion and order upon the issues presented to him and upon the record made before him, and shall serve such findings, opinions and order upon the parties and upon the board. Service may be personal or by registered or certified mail. The findings, opinions and order shall be just and reasonable and based upon the factors prescribed in subsection (4) of this section."

Subsection (4) of ORS 243.746 lists the following factors:

"(4) Where there is no agreement between the parties, or where there is an agreement but the parties have begun negotiations or discussions looking

comparison with employes at the Oregon Correctional Institution.[13]

■ The arbitrator, in the award, set forth the requirements of ORS 243.746(4) as well as ORS 240.235(1),[14] relating to the civil service compensation plan, and stated that he had considered all the factors listed. While ORS 243.746(4) requires the award to be based on the stated factors, nothing in the statute sets a standard for the detail an arbitrator must provide in a decision. ERB found that the arbitrator had considered the required factors since he had before him evidence relating to the state's ability to pay and to the wages, hours and conditions of employment for other state employes. We agree.

---

to a new agreement or amendment of the existing agreement, and wage rates or other conditions of employment under the proposed new or amended agreement are in dispute, the arbitration panel shall base its findings, opinions and order upon the following factors, as applicable:

"(a) The lawful authority of the employer.

"(b) Stipulations of the parties.

"(c) The interest and welfare of the public and the financial ability of the unit of government to meet those costs.

"(d) Comparison of the wages, hours and conditions of employment of other employes performing similar services and with other employes generally:

"(A) In public employment in comparable communities.

"(B) In private employment in comparable communities.

"(e) The average consumer prices for goods and services commonly known as the cost of living.

"(f) The overall compensation presently received by the employes, including direct wage compensation, vacations, holidays and other excused time, insurance and pensions, medical and hospitalization benefits, the continuity and stability of employment, and all other benefits received.

"(g) Changes in any of the foregoing circumstances during the pendency of the arbitration proceedings.

"(h) Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, mediation, factfinding, arbitration or otherwise between the parties, in the public service or in private service."

[13] It appears from the record that employes of Oregon Correctional Institution are represented by Oregon State Employes Association.

[14] ORS 240.235(1), having to do with the state Personnel Division, provides that:

■ We do not reach the state's argument challenging the amount of the salary increases. Where the parties, by law or by contract, have to submit their differences to arbitration, it is not the role of a reviewing court or ERB to substitute its judgment for that of the arbitrator on the merits of the award. *United Steelworkers v. Enterprise Wheel & Car Corp., supra; Ficek v. Southern Pacific Co.,* 338 F2d 655 (9th Cir 1964), *cert den* 380 US 988 (1965); *see Willamina Education Assoc. v. Willamina Sch. Dist. 30J,* 50 Or App 195, 623 P2d 658 (1981); and *Siegel v. Gresham Grade Teachers Ass'n.,* 32 Or App 541, 574 P2d 692 (1978).

## APPROVAL BY THE PERSONNEL DIVISION

The state contends: "The Board erred in affirming the arbitration award without the approval of the plan by the Personnel Division." It cites ORS 240.215, 240.233, 240.235 and 240.240 to establish that division's authority to establish a state classification plan, conduct a continuing salary survey and adopt a compensation plan for all classified and certain unclassified employes. The state maintains that, regardless of an arbitrator's authority, ORS 240.235(3)[15] makes it mandatory that "each employe" *shall* be paid at one of the rates set forth in the compensation plan for the class of positions in which he or she is employed and that this is the kind of "lawful authority" of the employer the arbitrator is required by ORS 243.746(4)(a) to heed.

■ It is significant at the outset to note that nothing in ORS ch 240 or ch 243 requires Personnel Division *approval* of an arbitrator's award or a collective bargaining agreement. In addition, the state does not argue that the award in this case violates the Personnel Division's authority to establish a salary plan. Instead, it implies that the salaries

---

"(1) The division shall adopt a compensation plan which shall include, for each class or position, a minimum and a maximum rate, and such intermediate rates as are considered necessary or equitable. In establishing the rates the division shall consider the prevailing rates of pay for the services performed and for comparable services in public and private employment, living costs, maintenance or other benefits received by employes, and the state's financial condition and policies."

[15] ORS 240.235(3) provides that:

"(3) Except as provided in subsection (4) of this section, each employe in the classified service shall be paid at one of the rates set forth in the compensation plan for the class of positions in which he is employed."

awarded by the arbitrator either are or will be different from the rates *presently* set by the division. On appellate review in such a situation our responsibility is to adopt an interpretation to give meaning to the provisions of both the PERA and the civil service laws and to harmonize seeming conflicts between them, if possible. *Norton v. State Compensation Dept.,* 252 Or 75, 448 P2d 382 (1968).

The state cites a recent California case, *Pacific Legal Foundation v. Brown,* 103 Cal App 3d 801, 163 Cal Rptr 298 (1980), as authority that a state's public employe collective bargaining law can be found unconstitutional where an irreconcilable conflict exists between the law and the state personnel board's authority to fix salaries. California, however, is one of four states in which the state *constitution* establishes the personnel board (Cal Const, Art VII § 2) and authorizes it to enforce the civil service statutes and adopt job classifications (Cal Const, Art VII § 3(a)).[16]

In *Brown,* the California Court of Appeals held that the constitutional responsibility of the state personnel board to classify civil service positions was inseparable from the authority to fix the salaries of civil service employes and that this authority necessarily reposed in the state personnel board alone. 163 Cal Rptr at 305. However, in the case before us, as the state itself recognizes, Oregon's Personnel Division is not imbued with constitutional authority, but is a creation of the Legislature. We are therefore not faced with a potential constitutional conflict between the principles of public labor law and state executive authority. We need only consider whether, in enacting ORS ch 243, the legislature intended to remove from the State Personnel Division the authority to fix salaries for public employes in the collective bargaining units involved here. Neither party cites any authority for its position, but we will consider how this problem has been resolved by courts elsewhere.

---

[16] The other three states which have established their state personnel board at a constitutional level are Georgia (Ga Const, Art IV & VI), Louisiana (La Const, Art X, § 1), and Michigan (Mich Const, Art XI, § 5). In four other states authority is vested by the constitution in the legislature to establish a civil service system: Alaska (Alaska Const, Art XII, § 6), Colorado (Colo Const, Art XII, § 13), Florida (Fla Const, Art III, § 14) and Kansas (Kan Const, Art XV, § 2).

The New Hampshire Supreme Court, in *State Emp. Ass'n of N.H. v. N.H. Pub., Etc.,* 118 NH 885, 397 A2d 1035 (1978), faced an almost identical issue in a dispute over the negotiability of job classifications, promotions, seniority and other matters, in addition to wages. It held that the state public employe collective bargaining statute (N.H. Rev Stat Ann 1977 § 273-A:3, 9) and the statutes which established the state personnel commission (N.H. Rev Stat Ann 1977 § 98:3, 8-a), when read together, granted the personnel department duties which included the compensation of state employes, but required the state to negotiate cost items and terms and conditions of employment, making wages a negotiable item between the public employer and organized public employes. The court found no intent on the part of the New Hampshire Legislature to repeal or alter its existing civil service law in enacting the public employes bargaining act, and determined that the effect was therefore to modify the personnel commission's role.

In *State v. State Supervisory Emp. Ass'n.,* 78 N.J. 54, 393 A2d 233 (1978), the New Jersey Supreme Court considered whether its public employe collective bargaining act was intended to supplant state civil service statutes relating to promotion, seniority, layoff and other matters, excluding wages. That court held that in construing both statutes to do minimum damage to each, the logical result was to give them *both* effect: it determined that, where a civil service statute or regulation set maximum and minimum levels of employe benefits, it remains for the mandatory negotiations between the parties to set the level within this range. 393 A2d at 246-247. The court noted: "Our holding is consistent with the current understanding and actual practices of those involved in the public employment relations field." 393 A2d at 247.

Because the New Jersey decision considered employe benefits other than wages, wages were not given as an example of a matter of employment relations for which the civil service authority might set maximum and minimum standards. However, the New York Supreme Court has so held in a similar situation. In New York, the state constitution (NY Const, Art VI, § 28) and Judiciary Law, NY Jud. Law § 39(8) (McKinney 1980), entrusted allocation of job classifications and salary grades for state judiciary

employes to the administrative board of the judicial conference. New York civil service law, NY Civ Serv Law § 200 (McKinney 1973), provided a right for public employes to organize and required public employers to negotiate with these organizations over terms and conditions of employment. In *Evans v. Newman,* 420 NYS2d 618, 100 Misc2d 207 (1979), the court held that the administrative board retained the power to assign each employe to a job classification and salary grade, but that an individual employe's salary within each grade would be the subject of negotiation, as would increases in the minimum and maximum salaries for each grade.

■ There is no indication that in enacting the Public Employment Relations Act, the Oregon Legislature meant to repeal or alter existing civil service law. Therefore, construing the two bodies of law together, *Norton v. State Compensation Dept. supra,* we conclude, as have the courts of New Hampshire, New Jersey and New York, that the effect of the PERA is to modify the authority of the State Personnel Division so that, while it retains responsibility for establishing general job salary grades and classifications, the specific salary within each range which is paid to an employe in a public employe bargaining unit is subject to negotiation or arbitration under the terms of ORS ch 243. To conclude otherwise would defeat the purpose of the public employe bargaining statute.

Under ORS 243.742(1), for certain state employes, binding, compulsory arbitration is the mandated alternative to a strike over a labor dispute. "Labor dispute" is defined at ORS 243.650(11) as "any controversy concerning employment relations * * *"; "employment relations" is defined at ORS 243.650(7) to include "direct or indirect monetary benefits." ORS 243.746(4) sets forth the required arbitration procedure when "wage rates or other conditions of employment" are in dispute. In addition, the Personnel Division's compensation plan itself is required to be the subject of good faith bargaining between the state and a union "whenever two or more labor organizations are certified to represent state employes in like classifications." ORS 243.696(1).[17]

---

[17] ORS 243.696(1) provides, in part, that:

■ ■　　We therefore hold that while the State Personnel Division retains the power to group all job positions into classes and to adopt, pursuant to ORS 240.235(1), for each class or position, a salary range which includes maximum, minimum and intermediate positions, that: (1) the establishment of the compensation plan itself can be a subject for bargaining between the state and the labor organizations and (2) the individual wage rates for public employes in collective bargaining units are to be set within the negotiated ranges.[18] Where the bargaining process breaks down, and the employes are forbidden by law from striking, the arbitrator has been given the authority to set new salaries for those employes. The Personnel Division does not have the authority to approve these rates. We conclude this was the intention of the legislature in enacting ORS 243.696 and ORS 243.742. Whether or not an arbitrator may unilaterally modify a salary *range* for a position, we need not decide here, because the state has presented us with no figures to indicate that this is or will be the case.

"(1) Notwithstanding any other provision of this chapter, whenever two or more labor organizations are certified to represent state employes in like classifications, the State of Oregon and the certified labor organization shall meet jointly at reasonable times and bargain in good faith for the purpose of establishing the compensation plan and other economic benefits, and those employment relations matters which require legislative action or are the subject of Personnel Division rulemaking authority. * * *."

[18] This is, in fact, the interpretation provided by the Employment Relations Board for the State Personnel Division in 1978, when the division sought a declaratory ruling as to whether ORS ch 240 and ch 243 might conflict in just the manner here considered. The Board, in *In the Matter of the Petition of the State Personnel Division for a Declaratory Ruling,* 3 PECBR 1860 (1978), said:

"[W]e see no conflict with ORS 240.235 if the Personnel Division were to adopt for a class of work a salary range which encompasses the miminum rate *negotiated,* the maximum rates *negotiated,* and the intermediate rates *negotiated.* Employes in the same class would be paid at the rate or rates in the salary range *negotiated* between their bargaining representative and the state.

"* * * * *

"This Board believes that ORS ch 240 (Merit System Act) can be read in harmony with ORS 243.650 *et seq.* (Public Employe Collective Bargaining Act) * * *

"ORS ch 240, when viewed in conjunction with the joint bargaining provisions of ORS 243.650, *et seq.,* does not require the Personnel Division to adopt a salary schedule which is identical in minimum, intermediate, and maximum rates for all employes in a class." 3 PECBR 1860, at 1862-63 (Emphasis added.)

## APPROVAL BY THE GOVERNOR

■ The state maintains "The Board erred in approving salary increases without the approval of the Governor." ORS 240.235(2), relating to the Personnel Division's adoption of a compensation plan, provides: "Modifications of the plan may be adopted by the division and shall be effective only when approved by the Governor." AFSCME insists, and the state put on no evidence to the contrary, that they are *not* seeking to modify the plan, but are seeking only a change in individual wage rates.[19]

## FAILURE OF ARBITRATOR TO FOLLOW PROCEDURE MANDATED BY ORS 243.746(3).
ORS 243.746(3) provides:

"The arbitrator shall establish dates and places of hearings. Upon the request of either party or the arbitrator, the board shall issue subpenas. The arbitrator may administer oaths and shall afford all parties full opportunity to examine and cross-examine all witnesses and to present any evidence pertinent to the dispute."

The state argues that this procedure, coupled with the requirement of ORS 243.752 that the arbitrator's award be supported by substantial evidence on the record as a whole, portrays a proceeding in the nature of a contested case under the Administrative Procedures Act, ORS ch 183, and that therefore ERB must have for review a verbatim transcript of all testimony before the arbitrator, apparently relying on ORS 183.415(10). The state contends that without such a record it is impossible for ERB to determine whether the award was supported by substantial evidence in "the whole record."

■ However, what the state is claiming is an error in procedure. It does *not* contend that the arbitrator's award was not supported by substantial evidence. Absent such a contention we fail to see how the state was injured by the failure of the arbitrator to follow certain procedures, if that in fact occurred. In addition, no request for a verbatim

We assume that this interpretation is consistent with the current understanding and actual practices of those involved. *See State v. State Supervisory Emp. Ass'n, supra,* 393 A2d at 247.

[19] To require the approval of the governor, who is head of the Executive Department, for any salary increase in the agreement between the Executive Department and the union would undermine the bargaining process itself.

transcript was made before the arbitrator nor was the necessity for such a transcript raised before ERB. The state may not, at this point, raise an issue which could have been raised, and corrected, at the beginning of this already extended proceeding.

Here, although there was no 'transcript of the proceeding before the arbitrator, the entire arbitrator's file was in evidence before ERB, and it contained:

1) A 50-page typewritten summary by the arbitrator of the oral testimony;

2) The arbitrator's notes of the testimony;

3) Exhibits, including the Personnel Division's 1978 Salary and Benefit Survey Report, the 1977 collective bargaining agreement between the state and AFSCME as well as that between the state and the Oregon State Employes Association, the Council on Wage and Price Stability's 1978 Standards, Clarifications and Additional Information on "Voluntary Standards for Noninflationary Pay and Price Behavior," and the May 31, 1979, factfinder's report.

For each specific portion of the award, the arbitrator stated the evidence upon which he based his decision. The state may not now object to that procedure. We turn next to AFSCME's contentions regarding the scope of the award.

### WHO ARE "GUARDS" FORBIDDEN FROM STRIKING BY ORS 243.736

AFSCME makes two separate assignments of error regarding ERB's determination that only those employes formally designated correctional officers, corporals or sergeants are "guards at a correctional institution" forbidden from striking by ORS 243.736 and entitled to compulsory arbitration under ORS 243.742. AFSCME argues: (1) that the members of Locals 2623-A and 2623-B are "guards" within the meaning of the statute because they perform security functions in addition to their other duties and because the legislature's purpose in enacting the strike ban was to eliminate strikes by all employes at correctional institutions; and (2) that ERB's findings of fact on this issue are inadequate to support its conclusions.

AFSCME urges that ERB misinterpreted the applicable law and that we are free to substitute our own conclusions unless interpretation of the statutory terms

calls for an agency value judgment or requires expertise peculiar to the agency. AFSCME insists that the meaning of the term "guard at a correctional institution" is "as accessible to the courts as to the agency." ERB interpreted the term as one for which the legislature has delegated to this Board the responsibility 'for completing a value judgment that the Legislature has only indicated,'" citing *McPherson v. Employment Div.,* 285 Or 541, 591 P2d 1381 (1979). ERB then concluded that the term "guard at a correctional institution" means only those employes whose "focal job duties" are inmate control.

On review we must first determine whether "guard at a correctional institution" is a term of complete meaning subject to ultimate interpretation by the court, or whether it is a term of delegation which ERB must construe by a refinement of legislative policy. *See Springfield Education Assn. v. School Dist.,* 290 Or 217, 621 P2d 547 (1980). We disagree with ERB's conclusion that "guard at a correctional institution" is the kind of delegative term which "calls for completing a value judgment that the legislature has only indicated." *McPherson v. Employment Divison,* 285 Or 541, 550, 591 P2d 1381 (1979). Although we recognize, as noted in *Springfield, supra,* 290 Or at 231-233, that the legislature has provided an extensive statutory scheme regulating public employe labor relations in which ERB has administrative, regulatory and enforcement responsibilities, *id.* at 232, the legislature expressed its policy choice in ORS 243.726 when it specified those absolutely forbidden from striking as "any policeman, fireman or guard at a correctional institution or mental hospital." We conclude that the term "guard at a correctional institution" is a term requiring only interpretation to determine the intended meaning of the legislature.[20]

---

[20] As explained in *Springfield:*

"In saying that the legislature has completely stated its meaning and that the court ultimately discerns and applies that meaning as a matter of law, we recognize that imprecise terms in this second class are capable of contradictory applications, all of which are within the dictionary meanings of the term. We refer to the legislature having expressed itself not in the semantic sense, but rather in the sense of having made a complete policy statement. Whether any possible meaning comes within the intended meaning depends upon the policy which the word or phrase is intended to convey. Thus, when we refer to a term representing a complete legislative expression, we refer to a completed legislative policy judgment having been made." 290 Or at 225.

Although *Springfield* indicates that this determination is one of law, ultimately for the court, 290 Or at 224-228; ORS 183.482(8)(a),[21] it also defines the court's function as one of review only, stating:

> "The dispositive question of law on review under [ORS 183.482(8)(a)] is whether the agency action is within the legislative policy which inheres in the statutory term." *Id.* at 227.[22]

ERB determined that the definitive feature of the guard function involves prisoner control and concluded:

> "Those employes are guards at a correctional institution whose focal job duties are to keep the inmates in, and under the control of the institution."[23]

ERB noted that the legislative history provides no insights into the intended meaning of the term and that the term does not appear anywhere else in the Oregon Revised Statutes. In arriving at its interpretation, ERB relied upon the policy expressed in the PERA which absolutely forbids strikes by certain public employes, but also provides for enjoining a strike by other public employes if a "clear and present danger or threat to the health, safety or welfare of the public" is presented. ORS 243.726(3)(a). ERB noted:

> "In other words, the PERA draws a distinction between, on the one hand, those employes who might or might not be

---

[21] ORS 183.482(8)(a) provides that:

"The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law."

[22] We admit to being somewhat uncertain how this standard of review differs from the review of delegative terms under *Springfield,* described as follows:

"The discretionary function of the agency is to make the choice and the review function of the court is to see that the agency's decision is within the range of discretion allowed by the more general policy of the statute." 290 Or at 229.

[23] In explaining its use of the term "focal job duties" in the definition of guard, ERB stated:

"We intentionally use the term 'focal' rather than 'primary' or 'principal' because the latter terms come with a built-in ambiguity between 'most important' and 'most time consuming.' We intend instead to draw attention to the *purpose* intended to be served by the subject classification as part of the employers personnel structure."

allowed to strike, depending on whether, in the opinion of the court, the facts and circumstances in a particular case present a clear and present danger or threat, and, on the other hand, those employes for whom the Legislature has already made the 'clear and present danger' decision *a priori,* without the need to examine the facts and circumstances on a case-by-case basis."

■ The parties agree that the policy behind the absolute prohibition on striking is the protection of public safety. Given the possibility of enjoining any strike by public employes on public safety grounds, we believe it follows that the legislature intended to include in the absolute prohibition against strikes only those public employes whose job duties are such that it is apparent without a case-by-case determination that a strike would create a public danger or threat. We find that the definition of the term "guard at a correctional institution" adopted by ERB is within that legislative policy.

We now turn to the question of whether the findings made by ERB support its conclusion that, of the employes at OSP and OWCC, only correctional officers, corporals and sergeants are "guards" within the statutory meaning. ERB's findings on this issue are as follows:

"About 200 (including some excluded employes) of the approximately 440 OSP and OWCC employes are designated as security staff. There are 30 to 35 craftsmen (furniture making, metal work, etc.) who are vocational supervisors for the inmates. There are also 18 to 20 personnel in the plumbing, electrical, carpentry and paint shops; all of these employes supervise inmate workers. There are about 11 employes whose purpose is to run the hobby shop, recreation yard and inmate clubs. The units also include farm supervisors, school teachers, psychologists, stewards, nurses and clerical staff, and other categories of employes. Many of these employes also supervise inmate workers.

"The parties stipulated that Correctional Officers, Corporals and Sergeants are guards within ORS 243.736. Every employe at OPS and OWCC is expected to pay careful attention to prisoner security. It appears that, in a sense, security is every employe's responsibility. Many of the employes not stipulated to be guards have security duties peculiar to their jobs: e.g., stewards must watch for pilferage of knives, the hobby shop supervisor for pilferage of jewelers' saws, the nurses for theft of drugs, etc. All but

about 17 of the OSP and OWCC employes are a part of the police and fire retirement plan because of the extent of contact between those employes and the inmate population. However, only the Correctional Officers, Corporals and Sergeants are hired specifically for security care and control. Of the other employes, teachers are hired to teach, nurses to nurse, stewards to prepare food, welders to do welding, etc."

These findings indicate that employes other than correctional officers, corporals and sergeants have security responsibilities in addition to their other duties. They are not, however, hired to maintain prison security, but perform those security functions only as required in connection with the jobs which they *were* hired to perform, such as teaching, nursing, food preparation, etc. We conclude that these findings support ERB's conclusion that OSP and OWCC employes other than correctional officers, corporals and sergeants are not "guards at a correctional institution."

### *APPLICATION OF ORS 243.726(1)*

AFSCME argues in the alternative that even if the non-security employes in Locals 2623-A and 2623-B are not guards, they are forbidden from striking and therefore are entitled to compulsory arbitration by the terms of ORS 243.726(1), forbidding participation in a strike by any public employe who is included in an appropriate bargaining unit which provides for resolution of a labor dispute by referral to final and binding arbitration.

AFSCME's position is that *all* members of a bargaining unit which includes *some* members forbidden by ORS 243.736 from striking are "included in an appropriate bargaining unit which provides for resolution of a labor dispute by referral to final and binding arbitration." The state's position is that the language "which provides for" in the statute limits its application to members of bargaining units in which the unit as a whole, by collective bargaining agreement or otherwise, has agreed to submit labor disputes to binding arbitration.

Although this argument has been part of AFSCME's contentions since the initial unfair labor practice complaint was filed, ERB failed to make any ruling on

this issue in its order of May 23, 1980. The parties do not dispute that Locals 2623-A and 2623-B have been certified by ERB as appropriate bargaining units.[24] The only issue for determination is whether each is a unit which "provides *for resolution of a labor dispute by referral to final and binding arbitration.*" ORS 243.726(1). Resolution of this issue is a matter of statutory interpretation; it is a question of law and, as such, is ultimately a question to be decided by the court, unless it involves a "term of delegation" which authorizes ERB to construe it by a refinement of legislative policy. *Springfield Education Assn. v. School Dist., supra.* Interpretation of the statutory phrase at issue calls essentially for an explanation of how the statute applies in a particular fact situation. *Springfield, supra,* 290 Or at 234. Ordinarily, as noted in *Springfield,* the initial responsibility for explanation is a matter for the agency: "* * * the function of the court is to review an interpretation if review is sought, rather than to formulate it in the first instance * * *" *Id.* However, in this case we are faced with an agency's failure to address a law question in the midst of protracted and complicated litigation. Where the agency cannot be said to possess any "expertise based upon qualifications of its personnel or because of its experience in the application of the statute to varying facts," *Springfield, supra* 290 Or at 228, there is nothing to be gained by remanding the issue for its determination on the question, and we do not believe *Springfield* requires us, in such a situation, to do so. The interpretation of the statutory language at issue would ultimately be one for the court. We have therefore, proceeded to determine the legislative intent in enacting ORS 243.726(1).

---

[24] The responsibility for determining what is an appropriate bargaining unit rests with ERB. ORS 243.650(1) provides:

"'Appropriate bargaining unit' means the unit designated by the board to be appropriate for the purpose of collective bargaining."

ERB has adopted rules governing standards for these units. OAR 115-25-050, effective January 9, 1980, is essentially the same as former OAR 13-025 (10-15-74):

"115-25-050 (1) A bargaining unit may consist of all of the employes of the employer, or any department, division, section or area, or any part or combination thereof, if found to be appropriate by the Board.

"(2) In considering whether a bargaining unit is appropriate, the Board shall consider such factors as community of interest (*e.g.,* similarity of duties,

Guards in these two bargaining units are forbidden from striking or recognizing a picket line by ORS 243.736. For them the right to strike is prohibited by law, and it has been provided by statute that their labor disputes shall be settled by resort to compulsory arbitration. ORS 243.742(1). In the absence of any further statutory provisions, other members of the same bargaining units would be outside the requirements of compulsory arbitration and free to strike. This illogical result would fragment the bargaining units, weaken their ability to bargain together for common goals and generally fly in the face of the very purpose of union organizing. Here the collective bargaining agreement between the state and locals 2623-A and 2623-B contained a "no-strike" clause but no reference to arbitration. Under federal labor law, a no-strike obligation, express or implied, has been seen as the *quid pro quo* for a grievance arbitration agreement. *Textile Workers Union v. Lincoln Mills,* 353 US 448, 455, 77 S Ct 923, 1 LEd 2d 972 (1957); *Boys Markets Inc. v. Retain Clerks Local 770,* 398 US 235, 90 SCt 1583, 26 LEd 2d 199 (1970). In this case we are inclined to infer the converse — binding arbitration in exchange for a no-strike agreement.

The provisions for compulsory arbitration are to be liberally construed. ORS 243.742(1). We therefore conclude that, when *some* members of a certified bargaining unit are prohibited by law from striking and required by law to resort to compulsory arbitration as a means to end labor disputes *all* members of those bargaining units are "public employe[s] * * * included in an appropriate bargaining unit which provides for resolution of a labor dispute by referral to final and binding arbitration * * *," under ORS 243.726(1).[25] Therefore, all members of Locals 2623-A and

---

skills, benefits, interchange or transfer of employes, promotional ladders, common supervisor, etc.), wages, hours and other working conditions of the employes involved, the history of collective bargaining and the desires of the employes. The Board may determine a unit to be an appropriate unit although some other unit might also be appropriate.

"(3) Bargaining unit(s) shall not include elected officials, persons appointed to serve on boards and commissions, or confidential or supervisory employes."

[25] We note that although ORS ch 243 is patterned after the National Labor Relations Act, 29 USC § 151, *et seq,* it does not include language such as that at § 159(b)(3), added by the Taft-Hartley Act, 61 Stat 136 (1947):

2623-B, since they are forbidden by law from striking, are parties to a labor agreement in which the law provides that settlement of labor disputes shall be by final and binding arbitration. The arbitrator's award, issued October 27, 1979, granting retroactive raises to July 2, 1979, is therefore applicable to all members of these two bargaining units.

### LOCAL 191-B

AFSCME contends that the members of Local 191-B, juvenile parole and probation officers employed by Children's Services Division, whom the state classifies as "correctional counselors," are "policemen" within the meaning of ORS 243.736. AFSCME maintains that adult community services counselors are sworn police officers, citing *AFSCME v. Correction Divisions, et al,* Case No. C-288, 1 PECBR 133, 138 (1974), and that since the duties of these employees and juvenile probation and parole officers are essentially the same, Juvenile Probation Officers (JPOs) are policemen as well. "Policeman" is not defined by statute for purposes of ORS 243.736.[26]

---

"The Board shall not * * * decide that any unit is appropriate for such purposes if it includes, together with other employes, any individual employed as a guard to enforce against employes or other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises. * * *"

This section of the Act also provides that no labor organization can be certified to represent a bargaining unit of guards if it 'admits to membership, or is affiliated directly or indirectly with' an organization which has non-guard members. Congress intended by this exclusion to prevent conflicts of interest in situations where guards are called upon to protect the employer's property, perhaps against union activities of other bargaining unit members. *See generally,* Shaw and Clark, *Appropriate Bargaining Units in the Public Sector,* 51 Or L Rev 151 (1971-72). A number of states, among them Vermont, Vt. Stat. Ann tit. 21 § 1543(a)(3), and Pennsylvania, Pa. Stat. Ann tit 43 § 1101.604(3) (Purdon), have statutes prohibiting the mixing of guards and non-guards in the same bargaining unit, perhaps to avoid the very type of problem posed by this litigation.

[26] ORS 243.005(2) provides a definition of "police officer," but only for insurance purposes:

" 'Police officer' includes police chiefs and policemen of a city who are classified as police officers by the council or other governing body of the city; sheriffs and those deputy sheriffs whose duties, as classified by the county governing body are the regular duties of police officers; employes of districts, whose duties, as classified by the governing body of the district are the regular duties of police officers; employes of the Department of State Police who are classified as police officers by the Superintendent of State Police; and

ERB made the following findings of fact regarding the JPOs:

"Each of the Juvenile Parole Officers is assigned to a region of the Children's Service Division. These regions cover the entire state. The JPOs work in the local communities and frequently work out of their own homes, although they are provided with office space in the CSD offices. Most of the juvenile "clients" spend an initial period of close custody in the Hillcrest or MacLaren juvenile facilities. The JPO makes contact with the client as soon as the client enters the facility and at least once monthly thereafter until the client is released from close custody; contact while the client is in the community occurs on a weekly basis at home, at school, on the job or on the streets. Typically, 40 percent of the JPO's clientele are in one of these facilities and 60 percent are in the community. When released from close custody, these clients have "conditioned liberty" and may be taken into custody by a JPO for violating any condition of their release. Most of the clients, were they adults, would be felons; approximately 40 percent have a history of violent crimes. The working relationship developed between the JPO and the client is very important to the success of the parole program.

"Juvenile Parole Officers have no powers of arrest, carry no badges and are not armed. They are issued handcuffs and restraints for use in returning a client to custody; these items are used frequently. If a client attempts to flee, the JPO has authority to request the juvenile institution to have the police issue an all points bulletin. The JPOs sought peace office status from the 1979 Legislature, without success."

Although AFSCME contended before ERB that the JPOs are either policemen or guards within the meaning of ORS 243.736, ERB did not specifically interpret the term "policeman," nor did it specifically conclude that the JPO's are not policemen under that statute, but only concluded that they are not "guards."

employes of the Oregon State Penitentiary and of the Oregon State Correctional Institution whose duties, as assigned by the superintendent, include the custody of persons committed to the custody of or transferred to the penitentiary or correctional institution; but 'police officer' does not include volunteer or reserve police officers or persons considered by the respective governing bodies to be civil deputies or clerical personnel." ORS 243.005(2).

As we noted previously, where the agency has failed to reach an issue of statutory interpretation which was raised by the parties below, and which does not involve the application of agency expertise or discretion, we will interpret the statute ourselves. Here we believe that the interpretation of the term "policeman" involves the application of the same legislative policy as the interpretation of the term "guard." Under this analysis the legislature intended to include in the absolute prohibition against strikes only those public employes whose job duties are such that it is apparent, without a case-by-case determination, that a strike would create a public danger or threat.

▪ Applying ERB's findings of fact in light of this policy, we conclude that the JPOs are not "policemen" as that term is used in ORS 243.736. Their authority relates only to their juvenile clients, about 40 percent of whom are in close custody in Hillcrest or MacLaren juvenile facilities. They have no power to arrest and are not charged with enforcing the criminal laws, *see* ORS 181.610(6), except that they may take their clients into custody for violation of the conditions of their release. Although we do not discount the importance of the supervisory function they perform, the threat of a strike by JPOs does not pose the type of immediate public danger that the statute contemplates. We affirm that portion of the ERB's order which denies the extension of the arbitrator's award to members of Local 191-B.[27]

Affirmed in part and modified in part.

_____

[27] AFSCME's final assignment of error urges us to remand to ERB for entry of a finding that in refusing to implement the arbitrator's award the state violated ORS 243.672(1)(f), violation of any provision of the PERA, as well as ORS 243.672(1)(g), refusal to accept the terms of an arbitration award. The specific section of the PERA which AFSCME contends was violated is ORS 243.752, which makes arbitration awards final and binding upon the parties. ERB found the state had committed an unfair labor practice based on subsection (1)(g) only. It observed in its order that the same conduct was alleged to have violated (1)(f) but said "This Board * * * has a long-standing policy of refusing to consider derivative violations of PERA (citations omitted)." Since ERB did find an unfair labor practice entitling AFSCME to remedies under ORS 243.676(2), we are unable to grasp, and the union has not enlightened us about, the significance of its contentions on this point.

**GILLETTE, P. J.,** concurring.

I join in the majority's opinion in this case. I write this separate opinion solely to point out my concern about the meaning of ORS 243.746(3) and 243.752.

As the majority acknowledges, there was no verbatim transcript of the proceedings before the arbitrator. In my view, this lack of a transcript would have made it impossible for ERB to conduct its review of the arbitrator's decision in the statutorily-mandated way, had the state not waived its right to a transcript by its silence. My opinion is based upon a consideration of the interaction of several provisions of ORS ch 243 and the particular language of one of those provisions, ORS 243.752, *infra.*

The statutory scheme permits employes (such as those involved here) who are not permitted to strike to obtain compulsory arbitration, including arbitration of wage demands. ORS 243.742(2). Any party or the ERB itself may initiate this arbitration. *Ibid.* The arbitrator, once chosen, is to conduct the hearing or hearings as provided in ORS 243.746(3):

"(3) The aribtrator shall establish dates and places of hearings. Upon the request of either party or the arbitrator the board shall issue subpenas. The arbitrator may administer oaths and shall afford all parties full opportunity to examine and cross-examine all witnesses and to present any evidence pertinent to the dispute."

The arbitrator's award is to be made according to certain specific criteria, as provided by ORS 243.746(4):

"(4) Where there is no agreement between the parties, or where there is an agreement but the parties have begun negotiations or discussions looking to a new agreement or amendment of the existing agreement, and wage rates or other conditions of employment under the proposed new or amended agreement are in dispute, the arbitration panel shall base its findings, opinions and order upon the following factors, as applicable:

"(a) The lawful authority of the employer.

"(b) Stipulations of the parties.

"(c) The interest and welfare of the public and the financial ability of the unit of government to meet those costs.

"(d) Comparison of the wages, hours and conditions of employment of other employes performing similar services and with other employes generally:

"(A) In public employment in comparable communities.

"(B) In private employment in comparable communities.

"(e) The average consumer prices for goods and services commonly known as the cost of living.

"(f) The overall compensation presently received by the employes, including direct wage compensation, vacations, holidays and other excused time, insurance and pensions, medical and hospitalization benefits, the continuity and stability of employment, and all other benefits received.

"(g) Changes in any of the foregoing circumstances during the pendency of the arbitration proceedings.

"(h) Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, mediation, factfinding, arbitration or otherwise between the parties, in the public service or in private service."

Not more than 30 days after the conclusion of the hearings,

"* * * the arbitrator shall make written findings of fact and promulgate a written opinion and order upon the issues presented to him *and upon the record made before him,* * * *. The findings, opinion and order shall be just and reasonable and based upon the factors prescribed in subsection (4) of this section." ORS 243.746(5). (Emphasis supplied).

Reference to the "record" also appears in ORS 243.752, which provides, in pertinent part,

"A * * * decision of the [arbitrator] * * *, *if supported by competent, material and substantial evidence on the whole record,* based upon the factors set forth in 243.746(4) shall be final and binding * * *, and may be enforced * * * in the circuit court for the county in which the dispute arose. * * *" (Emphasis supplied).

In the present case, one of the principal issues the state attempts to raise is the question of whether or not the arbitrator did, in fact, weigh all of the factors listed in ORS 243.746(4) and, further, whether, if he so weighed them, he

considered all of the evidence brought before him. If he did not, his award would not be "final and binding." ORS 243.752, *supra.* ERB is faced with the problem of determining whether the order is "final and binding" because the employes' representative bases its unfair labor practice upon the assumption that the order is "final and binding." ERB therefore must normally determine whether or not the arbitrator did, in fact, consider the "whole record" (ORS 243.752) and decide the case solely upon "the record made before him." (ORS 243.746(5)). The question is, can this be done without a transcript? The fact is that the state's waiver in this case relieves us of the duty of answering that question. However, I am offering my own view of the answer with an eye toward avoiding a problem where, in some future arbitration, one side or the other asks that the proceedings be transcribed.

As I view it, the answer to this question lies in our interpretation of the legislature's intent in using the phrase "on the whole record" in ORS 243.752. The phrase is really one of art, familiar to all practitioners of administrative law. It is a standard used in connection with judicial review of administrative cases: administrative decisions are not to be overturned on a factual basis so long as they are supported by "reliable, probative and substantial evidence in the whole record." This was precisely the statutory standard of review which existed in Oregon's Administrative Procedures Act (APA) at the time ORS 243.752 was enacted. Former ORS 183.480(7)(d).[1] Although ORS 243.752 uses "on" rather than "in," I have no difficulty in determining the genesis of the labor statute's language.

In my view, if the legislature used an APA term of art, it must have had in mind an APA-like meaning for the term. The term used is normally utilized as a standard of review and, as used in the context of this statutory scheme, it is a standard of review. Under the APA, such a review would require that the entire record, including the transcript, be before the reviewing body. In this case, the reviewing body was ERB. It had no transcript. It therefore could not carry out its function of determining that the arbitrator had properly considered the factors listed in ORS

---

[1] The present language is "substantial evidence in the record." ORS 183.482(8)(c).

243.746(4), and would have had to remand the matter to the arbitrator,[2] were it not for the state's waiver by silence.

---

[2] My only concern with this interpretation dealt with the making of a verbatim transcript before an arbitrator. Is this practical? Is it common? Apparently, it is not unusual. *See, e.g., Bernhardt v. Polygraphic Co.,* 350 US 198, 204 fn 4, 76 S Ct 273, 100 L Ed 2d 199 (1955); *see also* Eager, The Arbitration Contract and Proceedings; American Arbitration Association, Labor Arbitration Rules, Rule 21.