# STATE OF OREGON,
# DEPARTMENT OF HUMAN RESOURCES,
# MENTAL HEALTH AND DEVELOPMENTAL
# DISABILITY SERVICES DIVISION,
*Petitioner,*

*v.*

# AFSCME COUNCIL 75,
*Respondent.*

# (DR-1-92; CA A78077)

866 P2d 498

Richard D. Wasserman, Assistant Attorney General, argued the cause for petitioner. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Barbara J. Diamond argued the cause for respondent. With her on the brief was Bennett & Hartman.

Before Deits, Presiding Judge, and Edmonds and Leeson, Judges.

EDMONDS, J.

## EDMONDS, J.

Petitioner, State of Oregon, appeals from a declaratory ruling, ORS 183.410, by the Employment Relations Board (ERB) that behavioral group home employees are guards at a mental hospital within the meaning of ORS 243.736(1) and, therefore, are prohibited from striking. The apparent motivation for the petitioner seeking a declaration in its favor is that it would not be required to enter into binding arbitration with respondent if the bargaining unit members do not fall within the purview of the statute. ORS 243.742. We affirm.

ORS 243.736(1) provides:

"It shall be unlawful for any emergency telephone worker, police officer, firefighter or guard at a correctional institution or mental hospital to strike or recognize a picket line of a labor organization while in the performance of official duties."

ERB made extensive findings of fact about behavior group homes and what their employees do at the homes, which petitioner acknowledges are supported by substantial evidence.[1] It found that petitioner, through the Mental Health and Developmental Disability Services Division, operates three "behavioral" group homes for individuals with developmental disabilities.[2] The facilities are called behavioral because the residents have histories of various "inappropriate and unacceptable behaviors." One of the purposes of the facilities is to attempt to manage and modify those behaviors.

The group homes, which are located in residential communities, are considered treatment facilities and operate 24 hours a day, seven days a week. They are equipped with a

---

[1] In its conclusions and reasoning, ERB said:

"A strike by these employees would create a danger. Substitute workers would not be directly familiar with the individual behavior prescriptions for these clients, and might not be Mandt certified. The risk of clients injuring themselves or others or leaving the homes without permission and supervision would be increased[.]"

Petitioner argues that this is an additional finding, which is not supported by substantial evidence. Because the finding is not essential to our resolution of this case, we do not address the argument.

[2] The majority of the residents at the three group homes also have some form of mental illness.

security system that is connected to interior and exterior doors and windows. If a door or window is opened, an alarm sounds. The alarm is generally off during the day. An alarm control panel indicates specifically which door or window has been opened. The security system includes an intercom system, which is connected to the residents' bedrooms and can be used to monitor the residents while they are in their rooms. In addition, the windows are made of extra-thick shatterproof glass; the walls are backed by plywood; the doors are solid-core metal framed; and each home is enclosed by a six-foot chain link fence with a single unlocked gate.

Each of the three homes has five residents. All fifteen residents came from Fairview Training Center (Fairview). Thirteen of those were from secure cottages at Fairview, and most have been in other community programs but were returned to Fairview because of misconduct or because they could not adapt to a less-structured environment. Two of the residents are in the homes involuntarily. The others are there on a voluntary basis and have the legal right to leave the program.[3] ERB found that all five residents at one of the homes are not considered any less dangerous than when they lived at Fairview, and that they "are considered risks to the community." They have histories of sexual assaults, particularly on children, and most are repeat offenders. ERB found that these residents

"can become noncompliant and physically aggressive * * * [including] striking other clients and staff; kicking; biting; scratching; throwing furniture or other objects. These behaviors are unpredictable."[4]

---

[3] The legal right to leave does not mean that a resident has an immediate right to leave. The resident would have to go through certain administrative channels to be released from the program. Moreover, these group homes are different from other group homes in that they are designed to be a final destination. A resident in the behavioral homes cannot be returned to Fairview. Any behavioral problems must be resolved at the home. If a resident chooses to leave, an involuntary commitment proceeding could be brought under ORS 427.215 *et seq.*

[4] At the second home, the residents "are not considered a serious risk to the community." However, they do engage in "physical aggression, including pushing, shoving, and biting; property destruction; leaving without permission; [and] self-injurious behavior[.]" At the third home, the residents are not considered to be a significant risk to the community, although several have engaged in self-injurious behavior, and others have a history of property destruction.

Each group home has approximately 18 employees, including a manager who is excluded from the bargaining unit. All current bargaining unit members have worked at Fairview. Twenty-one of the employees have worked in "guard" positions while at Fairview. Respondent is the exclusive representative of employees who work in the group homes. There are three job classifications in the bargaining unit at the group homes: habilitative training technician 2 (HTT2); agency program trainer (behavior specialist); and manual arts instructor (vocational specialist). All staff members, regardless of classification, are required to monitor residents' behavior and location, to be familiar with residents' behavior prescriptions,[5] to be alert to actions that indicate an escalation of inappropriate resident behavior, and to be prepared to intervene to quell the behavior. Although considered a last resort, staff "regularly" physically restrain residents through the use of personal holds.

▮ Petitioner argues that ERB erred in concluding that the group homes are "mental hospitals" and that the bargaining unit members are "guards" within the meaning of ORS 243.736(1). We review ERB's order to determine whether the agency held correctly that the statute applies to the bargaining unit's members. In construing statutes, our task is to ascertain the intention of the legislature when it enacted ORS 243.726(1). In determining the intent of the legislature, we begin with the text and context of the provision. Other provisions of the same statutory scheme are part of that context. Whenever possible, provisions of a statute are construed so as to give effect to each. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993).

▮ ▮ We hold that the words "guard" and "mental hospital" within the meaning of ORS 243.736(1) are inexact terms. *See Springfield Education Assn. v. School Dist.*, 290 Or 217, 224, 621 P2d 547 (1980); *see also AFSCME v. Executive Dept.*, 52 Or App 457, 474, 628 P2d 1228, *rev den* 291 Or 771 (1982); *Fairview Training Center v. AFSCME*, 8 PECBR 6666, 6682 (1984). Our task on review of agency orders construing inexact terms is to discern and apply the

---

[5] Behavior prescriptions are individual plans developed to assist the resident in modifying inappropriate behaviors.

legislative policy that inheres in the term by its use in the statute. 290 Or at 225. To that end, an agency interpretation

> "may be given an appropriate degree of assumptive validity if the agency was involved in the legislative process or if we infer that it has expertise based upon qualifications of its personnel or because of its experience in the application of the statute to varying facts." 290 Or at 227.

We first consider petitioner's argument that ERB erred in concluding that the behavioral group homes are "mental hospitals" within the meaning of ORS 243.736(1). Petitioner argues that the legislature intended the term "mental hospital" to cover only facilities containing dangerous mentally ill or mentally retarded residents with security tantamount to that of a prison. It also argues that the legislature's purpose underlying the authorization of group homes precludes their classification as mental hospitals. We disagree with both arguments.

■ In *AFSCME v. Executive Dept., supra,* we held that the policy behind the absolute prohibition on striking under ORS 243.736 is the protection of public safety.[6] We said that the legislature intended to include only those public employees whose job duties are such that it is apparent without a case-by-case determination that a strike would create a public danger or threat in the absolute prohibition against strikes. By including the phrase "guard at a * * * mental hospital" in the strike prohibition under ORS 243.736(1), it follows that a "mental hospital" includes any facility providing residential services to mentally ill and developmentally disabled individuals who present a public danger or threat.

■ Petitioner does not dispute the importance of the security functions at the three group homes and it does not contest ERB's other findings that the group homes are located in residential communities, that some of the residents

---

[6] Since our opinion in *AFSCME v. Executive Dept., supra,* ORS 243.736 has been amended twice. Or Laws 1989, ch 1089, § 1; Or Laws 1991, ch 724, § 28. Those amendments do not affect our holding in *AFSCME v. Executive Dept., supra.*

have histories of physical aggression, sexual assaults on children, and that five of the residents pose a risk to the community.[7] Moreover, in *Fairview Training Center v. AFSCME, supra*, ERB concluded that Fairview is a mental hospital within the meaning of ORS 243.736. In this case, ERB relied on its decision in *Fairview* when it concluded that the group homes are mental hospitals within the meaning of ORS 243.736(1). It said that, although there are significant differences, Fairview and the group homes share "similarities of purpose," in that both function

"as treatment facilities with a long range goal of adjusting clients' maladaptive behaviors and instilling the skills necessary for independent living, and a short term goal of providing a safe and secure environment for the client while keeping the community safe from the client. The clientele is the same since all group home clients were formerly Fairview residents. The group homes are secure facilities with alarm systems and fenced yards. Though perhaps not as secure as the locked cottages at Fairview, the homes are nonetheless designed to prevent the clients from easy egress."

In the light of these facts, we agree with ERB that the group homes are mental hospitals within the meaning of ORS 243.736(1).

■       Petitioner also argues that ERB erred in concluding that the group home employees are "guards" within the meaning of ORS 243.736(1). In *AFSCME v. Executive Dept., supra*, we adopted ERB's definition of "guard" as used in ORS 243.736(1) and said that the definitive feature of a guard within the meaning of the statute involves prisoner control:

" 'Those employees are guards at a correctional institution whose focal job duties are to keep the inmates in, and under the control of the institution.' " 52 Or App at 475

---

[7] The manager of one group home testified on cross-examination:

Q: "It's an important goal in running the house, isn't it, that the residents don't wind up out in the community unsupervised?

A: "Yes, it is.

Q: "They have to have a staff person with them at all times in the community?

A: "Yes.

Q: "And that's because they could present a danger even to themselves or to members of the community?

A: "Yes."

(quoting from *AFSCME Local 2623A v. State of Oregon*, 5 PECBR 2967, 2974 (1980)).

In *Fairview Training Center v. AFSCME, supra,* ERB applied ORS 243.736 to employees at Fairview. It concluded:

> "Those employees are guards at a mental hospital whose focal job duties are to keep the residents in and under the control of the institution." 8 PECBR at 6682.

ERB also found that a psychiatric aide

> "works principally with groups of patients on a living unit in a state hospital or institution, performing duties not requiring professional nursing training. [The psychiatric aide] instructs, directs and assists patients to provide for their rehabilitation and self-reliance through encouragement toward more rational behavior and self-confidence; and through guidance in day-to-day living and social adjustment, personal care and grooming, care of property, and recreational and work therapy activities; and does related work as required." 8 PECBR at 6673.

Despite the therapeutic emphasis of the job duties, ERB concluded that psychiatric aides regularly assigned to locked security cottages have an *overriding responsibility* for keeping residents of those facilities in and under the control of Fairview. Therefore, they were guards within the meaning of the statute. 8 PECBR at 6683.

Finally, in *State of Oregon, Executive Department, Labor Relations Division v. Oregon Public Employees Union*, 9 PECBR 9410 (1987), ERB again considered the application of ORS 243.736 to employees of a mental hospital. Relying on its previous decisions applying ORS 243.736, it concluded that employees of a mental hospital generally have one of five focal job duties, including:

> "(2)  Provide custody, care, and treatment for patients who constitute a danger to others or to themselves. Patient custody is a focal concern of these employees, although treatment is another concern * * *." 9 PECBR at 9425.

In this case, ERB identified the general job duties for each classification at the behavioral group homes:

"8.   The behavior specialist analyzes client behaviors, develops the behavior prescriptions for each client, and monitors client compliance. The behavior specialist provides training to other staff members on the behavior prescriptions, and keeps statistical records on the specific behaviors of each client. The behavior specialist also monitors clients to determine whether other services are needed.

"The behavior specialists normally work during the day, but may work evenings or weekends as needed. The behavior specialist fills in for HTT2s when needed. The behavior specialist is required to respond when clients' behaviors become inappropriate and warrant intervention by staff. The behavior specialist also is required to monitor clients' whereabouts during the course of their shift.

"9.   The vocational coordinators are responsible for finding employment for the clients. The vocational coordinator meets with potential employers, develops jobs, has regular meetings with employers to determine if the client is performing acceptably, and visits the work sites periodically to observe the client's performance. The vocational coordinator trains the job coaches and works with the client to insure the client has the necessary skills to perform the job.

"The vocational coordinator may fill in for HTT2s when needed. The vocational coordinator normally works day shift, but may work evening and weekend hours when necessary. While in the group home, the vocational coordinator shares the responsibility for monitoring the location of the clients.

"* * * * *

"11.   The direct care HTT2s implement the individual client training programs and assist the clients in the development of necessary life-skills. HTT2s have the primary responsibility for *monitoring the whereabouts of clients to insure that clients do not injure themselves or others and do not leave the home without permission. They are responsible for monitoring clients' behaviors, documenting those behaviors, and implementing clients' behavior prescriptions if necessary. The direct care HTT2s maintain the home as a safe and hygienic living arrangement. They accompany clients whenever the client leaves the home, and maintain visual contact with clients when the client is in the home or yard."* (Emphasis supplied.)

Although the job duties are predominantly therapeutic, all staff members at each home are required to monitor residents' behavior and location, and be prepared to intervene to quell inappropriate behavior. Moreover, the class specification for HTT2 requires a "willingness to work with combative, unpredictable residents who may be dangerous to themselves and others."

Petitioner argues that the purpose of the group homes is not custodial, and that ERB's "implicit" conclusion that resident custody is the focus of the group homes' mission is contrary to the group homes' legislatively mandated purpose, which emphasizes community-based services aimed at helping the residents eventually to live independently and become integrated into the community. *See* ORS 427.007. It further argues that employee security functions are a means to provide care and treatment for residents rather than an end in themselves. *See State of Oregon, Executive Department, Labor Relations Division v. Oregon Public Employees Union, supra,* 9 PECBR at 9425.

Although we agree with petitioner's statement of the purpose of the group homes, the legislative purpose does not preclude a finding that the focal job duties of the employees involve control of the residents. The group home employees are all trained in a behavioral intervention process designed to manage resident behavior and to prevent "inappropriate behavior from escalating to the point where [a resident] could pose a danger to himself or others." The multi-step process requires using the least restrictive means to manage or alter behavior, beginning with verbal redirection. The final step involves a series of personal restraints that are used regularly in these homes. This management of resident behavior is the type of "control" that is intended not just to modify resident behavior and protect the resident but also to protect the public.

Accordingly, we conclude that ERB's ruling that the behavior group home employees are "guards" in a "mental hospital" is consistent with what the legislature intended those words to mean within the context of ORS 243.736(1). The employees of the three behavioral group homes have an overriding responsibility for keeping residents of those homes under control no matter where the residents are. In that

light, ERB's experience in the application of the statute justifies deference to its interpretation of the meaning of the statute. ERB did not err when it ruled that those employees are precluded by ORS 243.736(1) from striking.

Affirmed.