[No. G005909. Fourth Dist., Div. Three. Jan. 31, 1989.]

CITY OF SANTA ANA, Plaintiff and Respondent, v.
SANTA ANA POLICE BENEVOLENT ASSOCIATION et al.,
Defendants and Appellants.

**COUNSEL**

Seth J. Kelsey for Defendants and Appellants.

Edward J. Cooper, City Attorney, Richard E. Lay, Assistant City Attorney, and Frank L. Rhemrev, Deputy City Attorney, for Plaintiff and Respondent.

**OPINION**

**SILLS, J.\*** —May police officers engage in a "sick-out" (blue flu) during labor negotiations? *No.*

I

The Santa Ana Police Benevolent Association (PBA), a nonprofit association of sworn and nonsworn public safety employees of the Santa Ana Police Department and the City of Santa Ana were engaged in a "meet and confer" bargaining process for a new memorandum of understanding when their old one expired.[1] An agreement had not been reached, when, on July 9,

---

\* Assigned by the Chairperson of the Judicial Council.

[1] Government Code section 3500 et seq. sets forth the procedures for labor negotiations between municipalities and public employees. These sections are commonly referred to as the Meyers-Milias-Brown Act.

1987, 16 of the 18 officers on the graveyard shift telephoned that they were sick. These absences required 24 evening shift officers to remain on duty and work overtime for several hours each. Later that same day, 41 evening shift officers called in sick. On the following morning, 83 day shift officers claimed to be ill; and the entire graveyard shift remained on duty so that normal police operations could continue. At this point, the city obtained a temporary restraining order enjoining the PBA members from striking or "being absent from work claiming illness when not ill." The PBA complied with the order and there were no further work slowdowns. Later in the month, the court issued a preliminary injunction prohibiting the officers from "striking or calling or inducing a strike or work stoppage, including a work slowdown, or being absent from work claiming illness when not ill in the nature of a strike."

## II

The parties agree that all police functions were adequately staffed during the July 9 and 10 sick-out by using other officers working overtime or extra shifts. And, it appears the PBA and city recently reached an accord on a new memorandum of understanding. ■ Nevertheless, the issues raised in this appeal are "of continuing public interest and likely to recur in circumstances where, as here, there is insufficient time to afford full appellate review. Thus, it is appropriate to resolve the matter, notwithstanding the [aborted sick-out's] passage into history." (*Leeb* v. *DeLong* (1988) 198 Cal.App.3d 47, 51-52 [243 Cal.Rptr. 494]; see also *Gordon J.* v. *Santa Ana Unified School Dist.* (1984) 162 Cal.App.3d 530, 533 [208 Cal.Rptr. 657].)

■ The PBA frames the issue in this appeal as "whether or not it is proper, under state law, for a court to enjoin a public safety employee organization from engaging in a 'sick-out' which is organized in a manner calculated to avoid an imminent threat to public health or safety." The city maintains that pretextual illnesses of officers involved in labor negotiations create unreasonable overtime demands on officers who do report for duty, thus seriously impairing the efficiency of the police department. Regardless of the precautions taken to maximize officer and public safety under these circumstances, the city insists officers cannot work as effectively when they are burdened with extra shift duty.

The law on this subject has undergone a relatively recent change. Courts of Appeal traditionally held sick-outs by public employees to be per se illegal and the proper objects of injunctive, and in some cases tort, relief. (See, e.g., *Stationary Engineers* v. *San Juan Suburban Water Dist.* (1979) 90 Cal.App.3d 796 [153 Cal.Rptr. 666]; *Pasadena Unified School Dist.* v. *Pasa-*

*dena Federation of Teachers* (1977) 72 Cal.App.3d 100 [140 Cal.Rptr. 41]; *Los Angeles Unified School Dist.* v. *United Teachers* (1972) 24 Cal.App.3d 142 [100 Cal.Rptr. 806]; *Trustees of Cal. State Colleges* v. *Local 1352, S.F. State etc. Teachers* (1970) 13 Cal.App.3d 863 [92 Cal.Rptr. 134]; *City of San Diego* v. *American Federation of State etc. Employees* (1970) 8 Cal.App.3d 308 [87 Cal.Rptr. 258].) The discussion in the *American Federation* case is typical of the rationale adopted by the appellate courts: "The reasons for the law denying public employees the right to strike while affording such right to private employees are not premised on differences in types of jobs held by these two classes of employees but upon differences in the employment relationship to which they are parties. The legitimate and compelling state interest accomplished and promoted by the law denying public employees the right to strike is not solely the need for a particular governmental service but the preservation of a system of government in the ambit of public employment and the proscription of practices not compatible with the public employer-employee relationship. [Citations.]" (8 Cal.App.3d at p. 315.)

In 1985, however, a plurality of the California Supreme Court, after acknowledging the "critical commentary" which accompanied its past refusals to determine "the issue of the legality of public employee strikes," rejected this analysis in *County Sanitation Dist. No. 2* v. *Los Angeles County Employees' Assn.* (1985) 38 Cal.3d 564, 570-571 [214 Cal.Rptr. 424, 699 P.2d 835].[2] The plurality opinion first noted " 'the Legislature itself has steadfastly refrained from providing clearcut guidance" and has prohibited strikes by only one group of public employees, firefighters (Lab. Code, § 1962). (*Id.,* at p. 571.) The three-justice plurality then directed trial courts to consider public employee strike cases on an individual basis: "[W]e conclude that the common law prohibition against public sector strikes should not be recognized in this state. Consequently, strikes by public sector employees in this state as such are neither illegal nor tortious under Califor-

---

[2] The public employer in *Sanitation District* obtained tort damages, not injunctive relief against the striking employee association. Justice Broussard authored the plurality opinion in which Justices Mosk and Grodin concurred. Justices Kaus and Reynoso concurred only "insofar as [the opinion] holds that a peaceful strike by public employeees does not give rise to a tort action for damages against the union." (*Id.,* at p. 592 (conc. opn. of Kaus, J.).) These concurring justices cautioned, however, that "[t]he question of injunctive relief presents significantly different considerations than the propriety of a tort action, and it is not before us in this case." (*Id.,* at p. 593 (conc. opn. of Kaus, J.).) Former Chief Justice Bird concurred separately to elaborate on the plurality's view "that the right to strike may have constitutional dimensions." (*Id.,* at p. 594 (conc. opn. of Bird, C. J.).) Then Associate Justice Lucas dissented, expressing his view that "public employees in this state neither have the right to strike, nor should they have that right[,] [and] the courts should defer to the Legislature, a body far better equipped to create [ ] exceptions [to the basic 'no strike' rule.]" (*Id.,* at p. 609 (dis. opn. of Lucas, J.).)

nia common law. We must immediately caution, however, that the right of public employees to strike is by no means unlimited. Prudence and concern for the general public welfare require certain restrictions." (*Id.,* at p. 585.) The court added, "After consideration of the various alternatives before us, we believe the following standard may properly guide courts in the resolution of future disputes in this area: strikes by public employees are not unlawful at common law unless or until it is clearly demonstrated that such a strike creates a substantial and imminent threat to the health or safety of the public. This standard allows exceptions in certain essential areas of public employment (e.g., *the prohibition against firefighters and law enforcement personnel*) and also requires the courts to determine on a case-by-case basis whether the public interest overrides the basic right to strike." (*Id.,* at p. 586, italics added.)

In the context of the instant case, it seems clear that work slowdowns or stoppages by police officers tread dangerous waters. Contrary to the position taken in the city's brief, strikes by law enforcement officers are *not* specifically and unequivocally exempted from the court's decision in *Sanitation District.* The court did, however, allude to strikes by law enforcement as ones which would be restrained under the new test. References to law enforcement as being an area for continued application of the common law rules appear throughout the opinion. Chief Justice Bird, concurring, noted that only a flat prohibition against public employee strikes was overruled and that the state still had a compelling interest "in averting immediate and serious threats to the public health and safety." (38 Cal.3d at p. 609 (conc. opn. of Bird, C. J.).) Justice Broussard later summarized the *Sanitation District* decision in *City and County of San Francisco v. United Assn. of Journeymen etc. of United States & Canada* (1986) 42 Cal.3d 810, 813 [230 Cal.Rptr. 856, 726 P.2d 538]: "[W]e held . . . that public employee strikes were illegal only if they endangered the public health or safety."

The police argue that the particular activity sought to be enjoined must be analyzed in terms of whether a threat to public safety is present. We do not read *Sanitation District* as reaching this conclusion. Repeated references to strikes by police officers as ones which would still be prohibited lead us to conclude that police work stoppages are still per se illegal. On reflection, application of such a test to police functions would be an impossible task for the trier of fact. On most days, a work slowdown or stoppage by the police will not pose a threat to the public health or safety. On good days, there are no murders, no gridlock, and no chemical spills. A work slowdown by the graveyard shift on a quiet night might never be noticed. How wonderful hindsight. Appellate courts can look back months or years and conclude that a police strike did or did not imperil public safety. Unfortunately, trial judges asked to enjoin police strikes are not blessed with clairvoyant

powers—they cannot foresee an earthquake, a madman's shooting spree or a riot. If a disaster occurs during a police slowdown or strike, the inevitable investigation which will follow will undoubtedly point to the absent dispatcher or tardy patrol car as a cause. In the words of Milton, "They also serve who only stand and wait."

When a city is required to use the service of every officer who has already worked the night shift to meet the demands of the day shift, the obvious threat to public safety hardly merits discussion. The association presents the issue in their brief by asking: "May police officers lawfully engage in a short-term sick-out during labor negotiations if the concerted job action is conducted in such a manner as to allow for adequate staffing?" This framing of the issue begs the question. To argue that using officers who have already worked a shift constitutes adequate staffing is hokum. In addition, attempting to characterize the sick-out as "short-term" finds no support in the record: The "sick-out" turned out to be short-term only because it was terminated by court order.

The judgment is affirmed.

Wallin, Acting P. J., and Crosby, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 24, 1989. Mosk, J., was of the opinion that the petition should be granted.