800 A.2d 286 (2001)
352 N.J. Super. 501
BOARD OF EDUCATION of the TOWNSHIP OF MIDDLETOWN, Monmouth County, Plaintiff,
v.
The MIDDLETOWN TOWNSHIP EDUCATION ASSOCIATION, et al., Defendants.
Superior Court of New Jersey, Chancery Division, Monmouth County.
Decided December 6, 2001.
*287 Michael J. Gross and Douglas J. Kovats, Red Bank, for plaintiff, (Kenney, Gross, Kovats & Campbell, attorneys).
Sanford R. Oxfeld and Gail Oxfeld Kanef, Newark, for those defendants for whom an appearance was entered today, (Oxfeld Cohen, LLC, attorneys).
FISHER, Presiding J.
In the early morning hours of Thursday, November 29, 2001, contract negotiations between plaintiff board of education ("the board") and defendants' union leadership broke off. A few hours before school in the district was to commence that morning, defendant Middletown Township Education Association ("MTEA") and its members went on strike. Later that same morning, the board filed a verified complaint and sought the entry of an order to show cause with temporary restraints. In the afternoon, after hearing the arguments of counsel, the court entered an order which immediately prohibited defendants from, among other things, further engaging in a work stoppage.
The next day, persuaded by the board's contention that the work stoppage continued notwithstanding the injunction, the court entered an order compelling defendants to show cause why relief should not be entered coercing defendants into complying with the November 29 temporary restraining order pursuant to R. 1:10-3. Because of the rapidity with which the matter has come before the court, and because of the need, in this particular matter, to make the importance of compliance very clearnot only to defendants but also to the citizens of Middletown and the public in generalthe court again recites the legal bases for the November 29 temporary restraining order and the nature of relief granted on plaintiff's R. 1:10-3 application.

I

THE INJUNCTION
On November 29, the court ordered defendants to cease and desist from their unlawful work stoppage and return to work, in accordance with the unquestionable requirements of the law. While defendants appeared in opposition to the entry of that order and have since submitted a written memorandum in support of their position, the court herein reaffirms the November 29, 2001 order.

*288 A. The Illegality of Strikes by Public Employees
In Bd. of Ed., Bor. of Union Beach v. N.J.E.A., 53 N.J. 29, 36, 247 A.2d 867 (1968), our Supreme Court unequivocally stated that the illegality of strikes by public employees has "long been the rule in our State." Chief Justice Weintraub reiterated the Court's earlier emphatic declaration that "[w]hen government undertakes itself to meet a need, it necessarily decides the public interest requires the service, and its employees cannot reverse or frustrate that decision by a concerted refusal to meet that need." 53 N.J. at 37, 247 A.2d 867 (quoting In re Block, 50 N.J. 494, 499-500, 236 A.2d 589 (1967)). The Union Beach Court elaborated by declaring not only the illegality of public work stoppages in New Jersey but also any other concerted action with a similar design:
The public demand for services which makes illegal a strike against government inveighs against any other concerted action designed to deny government the necessary manpower, whether by terminating existing employments in any mode or by obstructing access to the labor market. Government may not be brought to a halt.

[53 N.J. at 37-38, 247 A.2d 867.]
This is not just something peculiar to New Jersey; it has long been well-established in this Nation, either by judicial decision or statute, that public employees may not strike unless expressly authorized by law. See, e.g., Norwalk Teachers' Ass'n v. Bd. of Ed., City of Norwalk, 138 Conn. 269, 83 A.2d 482 (1951); City of Manchester v. Manchester Teachers Guild, 100 N.H. 507, 131 A.2d 59 (1957); Potts v. Hay, 229 Ark. 830, 318 S.W.2d 826 (1958); Bd. of Ed., Martins Ferry City School Dist. v. Ohio Ed. Ass'n, 13 Ohio Misc. 308, 235 N.E.2d 538 (1967); and numerous other cases cited in Annotation, "Right of Public Employees to Strike or Engage in Work Stoppage," 37 A.L.R.3d 1147. This prohibition has been held to apply not only to public school teachersas herebut also firefighters, Garavalia v. Stillwater, 283 Minn. 335, 168 N.W.2d 336 (1969); police, City of Santa Ana v. Santa Ana Police Benevolent Ass'n, 207 Cal.App.3d 1568, 255 Cal.Rptr. 688 (1989); corrections officers, American Fed. of State, etc., Employees v. Executive Dept., 52 Or.App. 457, 628 P.2d 1228 (1981); public hospital employees, Jewish Hospital of Brooklyn v. Doe, 252 A.D. 581, 300 N.Y.S. 1111 (1937); sanitation workers, McAleer v. Jersey City Incinerator Auth., 79 N.J.Super. 142, 190 A.2d 891 (App.Div.1963); transit system employees, Hansen v. Commonwealth, 344 Mass. 214, 181 N.E.2d 843 (1962); highway personnel, New Jersey Turnpike Authority v. American Federation, 83 N.J.Super. 389, 200 A.2d 134 (Ch.Div. 1964); power and water department employees, Alcoa v. International Brotherhood of Elec. Workers, 203 Tenn. 12, 308 S.W.2d 476 (1957); port, harbor, river or channel authority workers, Delaware River & Bay Authority v. Intern. Org. of Masters, Mates & Pilots, 45 N.J. 138, 211 A.2d 789 (1965); welfare workers, County of Westchester v. Arfmann, 53 Misc.2d 642, 279 N.Y.S.2d 467 (1967); and even off-track betting employees, New York City Off-Track Betting Corporation v. American Federation, 99 Misc.2d 605, 416 N.Y.S.2d 974 (1979).
Strikes against the government have been uncompromisingly condemned by at least three presidents. Franklin Delano Roosevelt, not known for having been hostile to unions, called strikes against government "unthinkable and intolerable." Calvin Coolidge, while Governor of Massachusetts during the Boston police strike, famously stated with characteristic brevity *289 that there is no right to strike against the public "by anybody anywhere at any time." Woodrow Wilson was no less clear and emphatic, describing the Boston police strike, which occurred during his presidency, as "an intolerable crime against civilization."

B. Defendants' Attempts to Avoid the Common Law Prohibition on Public Employee Strikes
While inventive, defendants' claim that there has been erosion in the long-standing common law prohibition against public employee strikes is unconvincing.
Defendants have argued in past litigation,[1] and again, that the Legislature created exclusive jurisdiction in the Public Employment Relations Commission ("PERC") to deal with this labor problem, citing N.J.S.A. 34:13A-5.4(c). However, the Legislature's declaration that the "exclusive power" to prevent "anyone from engaging in any unfair practice" lies with PERC does not deprive this court of its inherent equity power to prevent the frustration of a government service caused by an illegal work stoppage. Indeed, it is well-accepted that the chancery court is a proper forum for granting injunctive relief to protect the status quo even when primary jurisdiction for the underlying dispute lies elsewhere. See, e.g., Ortho Pharmaceutical Corp. v. Amgen, Inc., 882 F.2d 806, 812 (3d Cir.1989); Steiger v. Armellino, 315 N.J.Super. 176, 183-84, 716 A.2d 1216 (Ch.Div.1998).
Defendants also contend the illegality of public employee work stoppages has been silently undermined by a recent decision of our Supreme Court. In State v. Intern. Fed., Local 195, 169 N.J. 505, 780 A.2d 525 (2001), the Court found the "no work, no pay" common law rule to be an "anachronism." With the abrogation of that rule, defendants believe other common law rules have now been moved to less firm ground than before. The fallacy of this contention is demonstrated by Justice Zazzali's opinion for the Court in Local 195 which, in fact, cites Union Beach as support for the statement that "employees do not have the right to strike in the public sector under our common law." 169 N.J. at 537, 780 A.2d 525. Rather than disturb the footing on which the November 29 injunction is placed, the Supreme Court has, once again, emphasized the still vital doctrine that public employees may not halt the workings of the government through an illegal work stoppage.
The Supreme Court also previously determined that the abrogation of the common law rule against public employee strikes is not something to be inferred but must be expressly declared. This principle emanates from an analysis of the impact of the state constitution on the common law prohibition. Article I, ¶ 19 of our 1947 Constitution provides that:
[p]ersons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing.
That constitutional provision has been harmonized by our Supreme Court as being consistent with the common law prohibition against strikes by public employees. In a number of decisions, including Union Beach, the Court determined that the state constitution might leave room for the Legislature *290 to permit certain public employees to strike, but emphasized that the Legislature would have to expressly announce such a right before the Court would even recognize that allowance, let alone find it constitutional. As the Court said in Delaware River and Bay Authority, supra, 45 N.J. at 148, 211 A.2d 789 (emphasis added), "[w]hile we are not prepared to accept and do not pass on the Authority's contention that a legislative grant to certain classes of public employees, of full collective bargaining rights including the right to strike, would be violative of Article I, ¶ 19, we are entirely satisfied that such a grant, being a sharp departure from prior law and policy, must be deliberately expressed and is not to be implied."
Since Delaware River and Bay Authority, nothing has occurred in either the Legislature or in the Supreme Court to expressly eviscerate the prohibition on public employee work stoppages. Again, in Union Beach it was held that the PERC statutes do not create the right to strike by public employees. 53 N.J. at 48, 247 A.2d 867. And, as noted above, there is nothing in the recent "no work, no pay" decision of our Supreme Court which expressly declared a change in the common law prohibition against public employee work stoppages. In short, despite the passage of time since Union Beach, nothing has occurred which would suggest that it possesses any less vitality. Accordingly, consideration of the Board's application for enforcement of this court's injunction starts with the premise that it is solidly grounded in our jurisprudence.

II

ENFORCING THE INJUNCTION
The power of the court to enforce an order has neither been put in question in this case nor is it questionable. R.1:10-3 provides the court with the ability to coerce compliance with its orders.[2] This power has existed at common law since "as early as the time of Richard III."[3]
The particular manner in which compliance may be sought is left to the court's sound discretion. It has been generally understood that the appropriate coercive method ought to be carefully tailored and sometimes issued in a particular sequencefrom least to most drastic. In truth courts should hesitate before leaping to the most severe sanction. Cf., Johnson v. Mountainside Hosp., Resp. Disease Assoc., 199 N.J.Super. 114, 488 A.2d 1029 (App.Div.1985). Justice should be tempered with mercy. But justice, which is nothing more (or less) than "truth in action," need not, indeed must not, be delayed or, in this case, it will truly be denied.[4]
*291 Accordingly, a court is not required to utilize a particular methodshown to be ineffectiveonly because it is more tepid than a severe method more likely to gain compliance. In other words, the court need not first utilize monetary sanctions when satisfied that this method will not obtain defendants' immediate compliance. The goal is compliance and nothing but compliance. In molding an appropriate remedy, a court's balancing of its coercive powers with care and mercy should not lose sight of the continuing harm done to the victims of defendants' contumacious conduct.
The recent history of teacher strikes in our State has demonstrated that monetary penalties have not been adequate to compel immediate compliance. During one recent strike elsewhere, the court heavily fined the union and also issued daily sanctions against strikers. Eight days elapsed before the strike ended and, ultimately, most of the sanctions were rescinded.[5] The result was a lengthy strike, a concomitant injury to school children and, as plaintiff argues, an emasculation of the prohibition on public employee work stoppages (and the lack of a deterrent effect) because of the ultimate rescission of most sanctions. Such a result could hardly discourage future illegal strikes.
It is important, in analyzing the problem, to emphasize that the court should be guided not only by some caution in ensuring that the method employed is not overly severe but also by the harm that is occurring through defendants' failure to comply. The court is not presently seeking to enforce a discovery order, or some other more mundane litigation problem, where monetary sanctions might provide a sufficient incentive to guarantee enforcement and timing is not critical. In those cases, the harm caused by recalcitrance is usually suffered only by another litigant and normally not irreparable. Here, enormous irreparable damage is being suffered by non-partiesthe citizens of Middletowndue to defendants' failure to comply with the injunction. Children are being deprived of the constitutional guarantee of a thorough and efficient education.[6] High school seniors, in the process of seeking acceptance to college, may also be severely impacted by the current situation. The time-consuming, methodical approach to coercion that might be warranted in most other lawsuits is inadequate here. This suit and the enforcement of the injunction are of great public importance. This court should not, therefore, experiment as to which method is the ideal nor need the court gently and slowly approach the point of true coercion. There is no time for that. The irreparable injury being caused by defendants' failure to comply is the polestar; caution over the degree of coercion is not a luxury which can be afforded here.[7]
*292 Accordingly, the court will presently set aside the first method of coercion suggested by the board, namely, the imposition of monetary penalties for each day defendants fail to return to work. That very method presupposes that compliance will take time. Such a method inherently suggests that the monetary per diem will accumulate to the point of intolerance and, then, compliance. The injury caused by this strike and defendants' failure to comply with the injunction must be addressed more swiftly. It cannot await the accrual of a sufficiently high monetary sanction.
Experience demonstrates that incarceration will more quickly generate compliance. The goal is to sufficiently "sting" the offending party in order to compel compliance. East Brunswick Bd. of Educ. v. East Brunswick Educ. Ass'n, 235 N.J.Super. 417, 422, 563 A.2d 55 (App.Div. 1989). The court is satisfied, from what has been presented, that a sufficient "sting" will not be felt by monetary sanctions but only through incarceration.[8] Accordinglywhile there will be consideration of the circumstances presented by each defendant during the individual hearingsthe court is satisfied that the preferred method of coercion is the incarceration of any party who has willfully and inexcusably defied this court's order. Each incarcerated defendant will be remanded to the Monmouth County Correctional Institution until such time as said defendant is willing to be brought before this court and state under oath a willingness to immediately return to work and fully comply with the injunction. Each defendant so incarcerated will remain fully empowered to obtain release from incarceration. Each defendant carries "the keys of their prison in their own pockets." In re Nevitt, 117 F. 448, 461 (8th Cir.1902). Each defendant need only comply with the simple requirement of stating under oath a desire to return to work; each defendant will, assuming the court finds such a statement to be genuine and made in good faith, be set free to return to work. Otherwise, each defendant guarantees his or her continued imprisonment and further coercion.[9]
The board has also requested an order deeming contumacious defendants to have forfeited their right to continued employment. While there is authority for the entry of such an order, see, e.g., Bd. of Ed. Voc. Sussex v. Sussex Voc.-Tec. Teachers, 170 N.J.Super. 426, 433, 406 A.2d 989 (Ch. Div.1979), it remains controversial. If that power exists, its utilization should await a determination as to whether incarceration generates the necessary "sting" to compel compliance with the existing injunction. Accordingly, the court will not presently enter such an order. Rather, the court will direct that any party who is still incarcerated after the passage of seven days be brought before the court at *293 which time the court will assess whether further incarceration will secure compliance. If the court determines that incarceration has not generated a sufficient "sting," and that continued incarceration will not generate a sufficient "sting," then the court will consider whether an order should be entered in the manner suggested by Sussex.[10]
Because of the "spin" and misinformation disseminated by the parties through the media as to the scope, content or meaning of the court's actions in this matter, the court sua sponte directed the MTEA, at their cost and expense, and as a further element of the court's power pursuant to R. 1:10-3, to make the court's written opinions available to all employees, students and parents upon demand. The MTEA was also authorized and directed to post signs in the schoolsand to publish such a notice in local newspapersadvising of the availability of the opinions.
NOTES
[1] The same parties were before this court for the same reasons three years ago. Bd. of Ed., Middletown Twp. v. MTEA, Docket No. MON-C-220-98.
[2] This, of course, is not the same as the power to punish for the violation of an order pursuant to R. 1:10-1 and 1:10-2.
[3] Justice Black observed that "as early as the time of Richard III it was said that the chancellor of England compels a party against whom an order is issued by imprisonment; and a little later it was said in the chancery that `a decree does not bind the right, but only binds the person to obedience, so that if the party will not obey, then the chancellor may commit him to prison till he obey, and that is all the chancellor can do.'" Green v. United States, 356 U.S. 165, 206, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958) (dissenting opinion). Of course, we now recognize there are other methods for securing compliance than imprisonment, but the underpinnings for R. 1:10-3 remain the same and our courts have recognized "the antiquity of the jurisdiction of courts to enforce their orders by conditional confinement." Green, supra, 356 U.S. at 205, 78 S.Ct. 632. See also, Shillitani v. United States, 384 U.S. 364, 368, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966).
[4] "Justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true." Snyder v. Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 78 L.Ed. 674 (1934) (Cardozo, J.).
[5] See, O'Brien, "Judges Getting Tougher on Teacher Strikes," 163 N.J.L.J. 1 (2001).
[6] "The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." N.J. Const., Art. VIII, § 4, ¶ 1.
[7] Enforcement through incarceration in this case is also not intended as a means of vindicating the dignity of the court or the person of the judge, which can be mistakenly understood from the emphasis placed on defendants' violation of the "court's order." The sole point to the enforcement of the injunction is the prevention of defendants' undue interference with the administration of justice and the restoration of the proper functioning of Middletown's schools.
[8] East Brunswick requires care in assessing monetary sanctions so that the sting for disobedience is not ruinously punitive. The court is persuaded that a termination of disobedience will not be served by undertaking the process of ascertaining an appropriate monetary sanction. In light of the many hundreds of employees who maybe subjected to coercion pursuant to R. 1:10-3, the court's ability to affect a cessation of the extensive disobedience of the November 29 order will be severely undermined if a lengthy process must be undertaken to ascertain the appropriate monetary sanction for each employee.
[9] These parameters are entirely consistent with R. 1:10-3. See, Essex County Welfare Bd. v. Perkins, 133 N.J.Super. 189, 195, 336 A.2d 16 (App.Div.) (the court "must determine that defendant has the ability to comply with the order which he has violated, and incarceration may be ordered only if made contingent upon defendant's continuing failure to comply with the order"), certif. denied, 68 N.J. 161, 343 A.2d 449 (1975).
[10] The strike ended on December 7, 2001. On that day, defendants agreed to return to work and the 228 employees incarcerated during the week were immediately released. With defendants' agreement to comply with the injunction and promise to return to work, a consent order was entered which transformed the prior order into a permanent injunction.