839 A.2d 159 (2003)
365 N.J. Super. 419
BOARD OF EDUCATION, TOWNSHIP OF MIDDLETOWN, Plaintiff,
v.
MIDDLETOWN TEACHERS EDUCATION ASSOCIATION, et al., Defendants.
Superior Court of New Jersey, Chancery Division, Monmouth County.
Decided July 31, 2003.[1]
*160 Gail Oxfeld Kanef, Newark, for defendants (Oxfeld Cohen, LLC).
*161 Mark P. Stalford, Assistant Prosecutor, appearing, for plaintiff (John Kaye, Monmouth County Prosecutor).
FISHER, P.J.Ch.
This matter came before the court upon the post-judgment application of 216 defendants ("the applicants") who were incarcerated for anywhere from one to five days in and about November and December 2001, pursuant to R.1:10-3, for failing and refusing to comply with an injunction entered in this civil matter. Seeking expungement of all records relating to their incarceration, applicants rely upon both the expungement statutes and the court's inherent equity powers.[2] Because the expungement statutes do not apply to R. 1:10-3 proceedings and their consequences, because it is doubtful the equitable power exists to grant the relief sought, and because equitable relief is not warranted in this case, the application will be denied.

I
The events which form the predicate for the present application need only be briefly recounted.[3] The applicants engaged in an illegal work stoppage, prompting the entry of a preliminary injunction. Applicants were served with the injunction, but continued to engage in this work stoppage. This led to a series of hearings culminating in the eventual incarceration of all the applicants. These incarcerations were based upon R.1:10-3, which allows a court to enforce its orders through various coercive means, including incarceration. Eventually, all defendants, including the applicants, agreed to return to work and, as a result, all the applicants were immediately released from jail. Now, applicants seek expungement of any record of their having been incarcerated during this proceeding, claiming the existing expungement legislation and an inherent equitable power authorize such relief.

II
The application, in the first instance, invokes N.J.S.A. 2C:52-1 et seq. as the legal basis for the relief sought. In this regard only, the Attorney General and the Monmouth County Prosecutor opposed the application, asserting that this statutory scheme does not permit expungement in civil matters. Their technical objections as to the particular form of the application need not long detain the court, since it is clear that the expungement statutes do not permit the relief sought by the applicants herein.[4]
The Prosecutor also contends that the matter should have been ruled upon by the Criminal Part judge designated to preside over expungement matters in this vicinage. Considering this court's familiarity with the underlying proceedings, *162 considering there is nothing in the statute which directs that only Criminal Part judges may hear such applications, and considering also that the General Assignment Order entered by the Chief Justice renders inconsequential any apparent lines created by a judge's particular assignment,[5] this court certainly is empowered and has jurisdiction over the matter. In other words, the jurisdiction to grant or deny relief pursuant to N.J.S.A. 2C:52-1 et seq. lies in the superior court and not with any particular superior court judge.
The court finding no insurmountable procedural obstacle, attention will be turned toward a consideration of the merits of the application.
There can be no question but that N.J.S.A. 2C:52-1 et seq. does not permit the relief sought herein. The Legislature defined "expungement" as the "extraction and isolation" of records "of an offense within the criminal justice system." N.J.S.A. 2C:52-1a. It has been held that this statutory scheme embodies "an expressed design to deal only with criminal charges and their consequences." Matter of M.D.Z., 286 N.J.Super. 82, 85, 668 A.2d 423, 424 (App.Div.1995) (emphasis added). As a result, the expungement statutes authorize the granting of relief regarding convictions of crimes, N.J.S.A. 2C:52-2, disorderly persons offenses and petty disorderly persons offenses, N.J.S.A. 2C:52-3, ordinance violations, N.J.S.A. 2C:52-4, juvenile delinquency adjudications, N.J.S.A. 2C:52-4.1, and convictions for certain drug offenses, N.J.S.A. 2C:52-5. The statutory scheme also provides for the expungement of records of arrests not resulting in convictions. N.J.S.A. 2C:52-6. This provision, however, also unambiguously forecloses the relief sought herein, since, again, it applies only when the person "has been arrested or held to answer for a crime, disorderly persons offense, petty disorderly persons offense or municipal ordinance violation." N.J.S.A. 2C:52-6a (emphasis added). As a result of the clarity of the limiting nature of these provisions, our appellate courts have held that claims not specifically delineated in these statutes may not form a predicate for the expunging of public records.
For example, in State v. K.M., 220 N.J.Super. 338, 339-40, 532 A.2d 254, 255 (App.Div.1987), the court held that Title 39 violations "do not fall within the specific categories covered by the expungement chapter" and relief may not be granted regarding such a matter even though the particular violation may permit imprisonment. And, in M.D.Z., the court held that "while a criminal charge and its related consequences that arise from a domestic incident may be subject to expungement, a domestic violence complaint arising from the same incident, in which the victim seeks restraints and other civil relief, is not." 286 N.J.Super. at 87, 668 A.2d at 425. As Judge Kestin summarized the approach to the scope of the expungement statutes in M.D.Z.:
Where the Legislature has been so meticulous in establishing what is within the scope of a statute, a court is hard-pressed to expand that coverage by divining a legislative purpose that is more inclusive. It is clear, from both the specific provisions of the expungement statute and its general tenor, that the Legislature intended it to encompass only criminal charges and their consequences. [286 N.J.Super. at 86, 668 A.2d at 425]
*163 The present situation does not remotely fall within the scope of the expungement statutes. The court's incarceration of the applicants was based upon its coercive powers to enforce orders in a civil case, pursuant to R. 1:10-3. Even the inaccurate contention that these applicants were held "in contempt"[6]in an attempt to suggest a quasi-criminal nature of the proceedingsis not sufficient to bring the matter within the scope of the statute.
An incarceration based upon R. 1:10-3 does not fall within the bounds of the expungement statutes. The reason this is so is not known and none of the parties has provided the court with any extrinsic evidence of the Legislature's intent for failing to include such matters. It may very well be that the Legislature was concernedas with Title 39 violationsthat our courts would be overwhelmed by countless such applications.[7] In any event, there is no need for the court to speculate as to the reasonsthe important point is that these statutes do not expressly permit the expungement of records created as a result of an order incarcerating a party pursuant to R. 1:10-3.

III
The applicants also contend that the court possesses the equitable power to grant expungement in the absence of statutory support. The authorities cited by applicants do not support this contention but further research reveals that there is some limited authority for the proposition that the power to expunge such or similar records exists.
That is, some courts have recognized a party's right to expungement of an arrest record based on purely equitable considerations independent of statutory authority. In our own State, trial courts have entertained such applications with mixed results. In Fernicola v. Keenan, 136 N.J. Eq. 9, 39 A.2d 851 (Ch.1944), for example, the applicant had been arrested on a charge of assault and battery, as a result of which he was fingerprinted, measured and photographed. The matter was presented to the grand jury which did not return an indictment. Notwithstanding, photographs of and other information about the applicant were retained in "what is popularly known as the Rogues' Gallery." Id. at 9, 39 A.2d at 851. Claiming embarrassment and the potential prejudice in obtaining future employment, the applicant sought an order requiring the removal of this information. The trial court concluded that the issue turned on the discretion of the police, explaining:
The taking of the fingerprints in the first place and the whole process of arrest *164 of a possibly innocent person are a humiliation to which he must submit for the benefit of society. To the same end, the police are justified in retaining such records, in certain cases, after an acquittal or a failure of the grand jury to indict. Sometimes a grand jury dismisses a charge because it seems trivial; sometimes the trial jury must acquit a guilty person because the evidence does not establish guilt beyond a reasonable doubt. In every large community are men who have never been convicted of an indictable offense but whose associations and manner of life are such that the police feel reasonably assured that such a one, unless he turn over a new leaf, will eventually be guilty of a serious crime. If he be lawfully arrested and fingerprinted, the police are justified in keeping the prints for possible use in the future, even though no indictment is found. On the other hand, when a man of good repute has a false charge made against him and is cleared of it, it seems to me that the police should destroy his fingerprints and photograph, or remove them from the rogues gallery. But in the absence of statute, discretion in the matter belongs to the police. Since they are responsible for our safety, it is for them to decide whose identification papers will be apt to assist them in the performance of their duty. It is not for the court to make the decision.
[136 N.J. Eq. at 10-11, 39 A.2d at 851-52 (emphasis added)]
While Fernicola did not acknowledge the equitable power to grant such reliefdeferring, instead, to law enforcement discretionthe trial court in In re Fortenbach, 119 N.J.Super. 124, 290 A.2d 315 (Cty.Ct. 1972) concluded that the court possessed the discretion to grant relief in areas not covered by the expungement statute.
In Fortenbach, the applicant was arrested and indicted for lewdness; he pleaded not guilty and the complaint was later dismissed. Citing applicant's "unblemished record" in the approximate 10 years since his arrest, and the "loss of economic benefits and psychological embarrassment," the trial court asserted that, in the absence of a statute to the contrary, it nevertheless possessed the discretion necessary to acknowledge "the equities involved" and grant relief. Id. at 129-30, 290 A.2d at 318. In a later case, however, the Appellate Division held that it was not "persuaded by [Fortenbach`s] reasoning and [did] not follow it" in construing the expungement statute in a factually similar context. In re Application of Raynor, 123 N.J.Super. 526, 528, 303 A.2d 896 (App. Div.1973).[8]
Other states have faced situations where applicants have sought expungement based upon equitable considerations. While some jurisdictions have refused to expunge records in the absence of statutory authority,[9] others have acknowledged a limited equitable right of expungement where, as in the federal cases cited in the margin, see, n. 8, supra, there are certain extreme circumstances which make such relief *165 "necessary and appropriate to preserve basic legal rights," as where an individual is arrested without probable cause or purely for the purpose of harassment. Bradford v. Mahan, 219 Kan. 450, 548 P.2d 1223, 1230 (1976); Mulkey v. Purdy, 234 So. 2d 108 (Fla.1970); State v. Pinkney, 33 Ohio Misc. 183, 290 N.E.2d 923 (1972); Eddy v. Moore, 5 Wash.App. 334, 487 P.2d 211 (1971); State v. Bellar, 16 N.C.App. 339, 192 S.E.2d 86 (1972); Doe v. Comdr, Wheaton Police Dep't, 273 Md. 262, 329 A.2d 35 (1974).
Certainly, it is arguable, particularly in light of some of these authorities, that the equitable power may exist in order to prevent law enforcement abuse or unconstitutional activities and where the Legislature neither permits nor precludes such relief. In criminal matters, the appellate authorities cited earlier would strongly suggest that even in egregious cases, the existing statutes have preempted the field. However, the existing statutes expressly deal only with criminal matters and, a fortiori, there is presently no reason to believe that any limited equitable power to grant relief in non-criminal matters has also been preempted by the existing statutes.
In this case, even if such equitable authority exists, the court would decline to exercise it in favor of applicants. The applicants here willfully disobeyed a court order and, as such, were found in violation of same. Applicant's argument that the stigma attached due to the record of their incarceration is unwarranted because they were involved in an instance of civil disobedience. The court rejects this gravely mistaken approach. These actions were not, for example, the equivalent of a trespass committed to emphasize the injustice of racial segregation or an unjust war. Applicants' acts of alleged civil disobedience caused the shut down of all public schools in Middletown, depriving thousands of children of their constitutional right to an education, all for the sake of applicants' financial well-being. Their actions do not conjure up thoughts of Thoreau, Gandhi or Martin Luther King.
In addition, earlier cases, such as Fernicola, suggest that relief may be denied for reasons of expediency. While the soundness of much of what was said in Fernicola is quite debatable, to the extent the court should consider the desires of law enforcement in this regard, this too would warrant a denial of the relief sought by applicants. Teacher strikes have occurred in this school district in 1998 and 2001. This might suggest a likelihood of another strike in the near future. If so, would it not be of benefit to the court and to the county to have the existing records retained for the foreseeable future?
In addition, if the matter may be resolved through consideration of the court's equitable powers, then should the court not balance the equities in ascertaining the most just result? In such circumstances, what is the harm to the applicants if these records are retained?[10] Nothing applicants has asserted would suggest any real or even psychological harm caused by the continued retention of these records.

IV
For the foregoing reasons, the court finds neither a statutory nor an equitable basis (assuming such power exists) to *166 grant the relief sought by the applicants. An appropriate order has been entered.
NOTES
[1] Section II of this opinion supersedes a written opinion of April 10, 2003.
[2] As it appears, according to the written and oral submissions of the Attorney General and the Prosecutor, the only records of the applicants' incarceration can be found either in the court's file in this civil matter and in the records maintained by the Monmouth County Correctional Institution (hereafter "the jail"). Applicants seek only the expungement of the latter.
[3] For further detail, see, Middletown Bd. of Ed. v. Middletown Tp. Educ. Ass'n, 352 N.J.Super. 501, 800 A.2d 286 (Ch.Div.2001).
[4] For example, the Prosecutor contends that this application should have been commenced by way of a separate, independent proceeding and not within the ambit of the civil action which gave rise to applicants' incarcerations. Indeed, it is claimed that there should have been 216 separate petitions for reasons which strike this court as valid but which need not be discussed at this time.
[5] The current Assignment Order states in pertinent part: "all Superior Court and Tax Court judges are hereby temporarily assigned to the Law Division (Civil and Criminal) of the Superior Court and the Chancery Division (General Equity and Family) of the Superior Court, the Tax Court, and all municipal courts in the vicinage to which they are assigned."
[6] These applicants were never held "in contempt." The relief granted was based upon R. 1:10-3 which imbues the court with broad powers to enforce its orders to "aid" a litigant in a civil suit. The court's earlier opinion in this matter, wherein the prior proceedings were summarized, in fact, does not contain the word "contempt." See, 352 N.J.Super. 501, 800 A.2d 286.
[7] Each day in this vicinage anywhere from a few to as many as 20 or 30 individuals are brought before a Family Part judge for a determination as to whether they should be incarcerated for having failed to pay child or spousal support pursuant to court order. Those proceedings, like the proceedings herein, are authorized and based upon R.1:10-3. If all those individuals will ultimately have the opportunity to seek expungement of the records of their incarceration, it can readily be seen that there would be a flood of such applications. As the court said in K.M., "the Legislature in removing Title 39 violations from the expungement statute must have been aware of the great number of such violations which are processed each year and may have decided not to burden the courts with their expungement." The same may also be true of R. 1:10-3 incarcerations.
[8] Federal courts have recognized that arrest records may be expunged in the absence of an authorizing statute for equitable reasons, but only in extraordinary circumstances such as where probable cause was lacking, where constitutional rights were flagrantly violated by the arresting officer, or in the case of mistaken identity. United States v. McLeod, 385 F.2d 734 (5th Cir.1967); Hughes v. Rizzo, 282 F.Supp. 881 (E.D.Pa.1968); Sullivan v. Murphy, 478 F.2d 938 (D.C.Cir.1973).
[9] Sterling v. City of Oakland, 208 Cal.App.2d 1, 24 Cal.Rptr. 696 (1962); Kolb v. O'Connor, 14 Ill.App.2d 81, 142 N.E.2d 818 (1957); Weisberg v. Police Dept. of Village of Lynbrook, 46 Misc.2d 846, 260 N.Y.S.2d 554 (Sup.Ct. 1965.)
[10] The mere fact that applicants were fingerprinted cannot be of concern to them since they were undoubtedly fingerprinted in order to gain school employment and those records were presumably shared with, or are available to, the Federal Bureau of Investigation and the Division of State Police. See, N.J.S.A. 18A:6-4.14.